[Civ. No. 14260. Third Dist. Nov. 19, 1973.]

CALIFORNIA LEAGUE OF SENIOR CITIZENS, INC., et al., Petitioners, v.
EARL W. BRIAN, JR., as Secretary, etc., et al., Respondents.

## COUNSEL

Ralph Santiago Abascal, Jay-Allen Eisen, John Denvir, J. Kendrick Kresse, Victoria De Goff, Phillip Neumark, Peter D. Coppelman and Peter E. Sitkin for Petitioners.

John L. Burton as Amicus Curiae on behalf of Petitioners.

Evelle J. Younger, Attorney General, Elizabeth Palmer, Assistant Attorney General, N. Eugene Hill and John Fourt, Deputy Attorneys General, for Respondents.

## OPINION

**JANES, J.**—This mandamus proceeding has its genesis in recent federal legislation commencing with the Social Security Amendments of 1972, Act of October 30, 1972, Public Law No. 92-603, 86 Statutes 1329, commonly known (and herein referred to) by its bill number in Congress, "H.R. 1." Section 303(a) of H.R. 1 repeals (effective Jan. 1, 1974) the previously existing system of federal participation in adult welfare programs through grants-in-aid to the states under the Social Security Act (title I, 42 U.S.C. § 301 et seq. [Old Age Assistance]; title X, 42 U.S.C. § 1201 et seq. [Aid to the Blind]; and title XIV, 42 U.S.C. § 1351 et seq. [Aid for the Permanently and Totally Disabled]). The correlative California provisions are set forth in the Welfare and Institutions Code: Old Age Security ("OAS"), commencing with section 12000; Aid to the Blind ("AB") section 12500 et seq.; and Aid to the Needy Disabled ("ATD") section 13500 et seq.

H.R. 1 replaces the three adult aid programs with a single federal program of aid to the needy aged, blind, and disabled, under title XVI of the Social Security Act. The new system is called the Supplemental Security Income Program ("SSI"). (Act of Oct. 30, 1972, Pub.L. No. 92-603, § 301, 86 Stat. 1465.) Payments under this program will be made directly to the recipients, rather than to the states in the form of grants-in-aid, and are to be in the amount of $130 per month for an individual, rising to $140

effective July 1, 1974.[1] (Act of July 9, 1973, Pub.L. No. 93-66, § 210, 87 Stat. 152.)

Unlike payments under the present grant-in-aid programs, the eligibility of individuals for SSI payments is not dependent upon any state action, since the program is fully administered by the federal Department of Health, Education and Welfare ("HEW") under uniform national standards.

A number of states, including California, presently provide aid grants in excess of the $130 SSI level. H.R. 1 encourages such additional assistance by providing for completely optional state welfare participation, above the $130 per month, through a system of State Supplemental Payments ("SSP"). (Act of Oct. 30, 1972, Pub.L. No. 92-603, § 301, 86 Stat. 1465, 1474.)[2]

In 1973, further amendments to the Social Security Act were enacted which, for all practical purposes, compel state participation in the SSP program by providing that unless a state enters into an agreement with HEW whereby the federal government is assured that all present recipients under the superseded programs (titles I, X and XIV) will receive additional aid through SSP, and further that the combined SSI and SSP payments will be at least equal in amount to the aid received by such recipients in December 1973, all federal participation in such state's Medicaid program (here, Medi-Cal) will be terminated. (Act of July 9, 1973, Pub.L. No. 93-66, § 212(a)(1), 87 Stat. 152, 155.)

Failure of California to fashion an SSP program in compliance with the 1973 supplementation requirements would cause termination of federal funds in support of Medi-Cal, resulting—all parties agree—in the' withdrawal of approximately $600 million in such federal funds for the fiscal year 1974-1975.

The 1972 and 1973 acts make available substantial benefits to participating states in the form of savings resulting from federal administration of the SSP program. If a state elects federal administration, all adminis-

---

[1] The SSI to an eligible couple will be $195, rising to $210 effective July 1, 1974. In this opinion we confine our discussion and computations to the grant figures for an individual. The conclusions which we reach herein necessarily require corresponding adjustments of the grant figures for an individual and eligible spouse.

[2] If a state elects to make SSP payments, supplements paid to recipients in that form will not be treated as "income" in the computation of an individual's eligibility for the $130 federal SSI payment. (Act of Oct. 30, 1972, Pub.L. No. 92-603, § 301, 86 Stat. 1465, 1474.)

trative costs are borne by the federal government and, additionally, a limitation is placed on future state fiscal liability for supplementation, based on total calendar 1972 state costs for grant-in-aid and expenditures under titles I, X and XIV of the Social Security Act. Under federal administration the state would be required to pay to HEW, each month, a sum equal to the anticipated SSP total, up to such hold harmless limitation. (Act of Oct. 30, 1972, Pub.L. No. 92-603, § 401, 86 Stat. 1485-1487.)

The California Legislature has, since 1945, recognized the possibility of withdrawal of federal welfare grants-in-aid to the state. Section 11011 of the Welfare and Institutions Code, based on former section 2025, as added by Statutes 1945, chapter 1355, section 1, page 2545, envisions the possibility of change in federal participation in state public assistance programs.[3]

During the 1973 legislative session, four separate bills were introduced for the purpose of conforming California law to the requirements of H.R. 1: AB 18 (Burton), AB 428 (Arnett), SB 53 (Nejedly), and SB 110 (Moscone). Essentially, the proposed legislation contemplated repeal of existing California statutes relating to aid to the aged, blind, and disabled and implementation by the state of a program of state supplementation pursuant to title XVI of the Social Security Act for services to the aged, blind, and disabled, with federal administration of the state supplements and an appropriation to the State Controller for the purpose of paying HEW for the supplemental payments. All four bills failed of passage.

Near the end of the 1973 legislative session, respondent Brian (Secretary, Health and Welfare Agency; hereinafter "Secretary") and respondent Swoap

---

[3]"If, when, and during such times as the United States government increases or decreases its contributions for any public assistance program in this state, other than aid to families with dependent children, above or below the amount being paid on January 1, 1963, or above or below the amount payable as a result of any such increase or decrease, the maximum grants of aid provided in that program shall be increased or decreased by an amount equal to such increase or decrease by the United States government. It is the intent of the Legislature that any change in contributions by the United States government, whether increase or decrease, shall result in a corresponding change in the amount of the maximum grants prescribed in the public assistance program to which the increase or decrease relates.

"In no event shall this section operate to decrease the maximum grant of aid prescribed in Section 12150 [OAS] below one hundred five dollars ($105) per month, prescribed in Section 12650 [AB], below one hundred twenty-two dollars ($122) per month, or prescribed in Section 13700 [ATD] below an average grant of one hundred ($100) per month.

"It is also the intent of the Legislature that should the federal government require that any increase in assistance granted by it after May 1, 1955, be considered necessary to meet medical or health needs of the recipient, such increase shall be considered necessary to meet such medical or health needs." (§ 11011.)

(Director, Department of Social Welfare; hereinafter "Director"), after receiving somewhat inconclusive advice from the Attorney General, stated that they would—with or without implementing legislation—establish by administrative regulations a program of SSP benefits effective January 1, 1974. Following the close of the legislative session, said respondents announced their intention (a) to hold a public hearing (which was held Nov. 16, 1973) to consider the adoption of such regulations; and (b) to enter into an agreement with the federal government for state participation in and federal administration of the state's adult aid programs.

Petitioners, two individual recipients and nine organizations representing, inter alia, recipients under the existing adult aid programs,[4] seek mandamus to prevent the Secretary and Director from inaugurating the proposed SSP (adult aid) program in a manner which allegedly places that program in direct conflict with existing state law; and to prevent respondent Flournoy (State Controller) from drawing warrants in favor of HEW under the obligation of the contemplated agreement for federal administration. ■ Extraordinary relief in the nature of mandamus is a proper remedy where the issues are of great public importance and must be resolved promptly. (*County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841 [59 Cal.Rptr. 609, 428 P.2d 593].)

The basic questions raised in this proceeding are the following:

1. Does Welfare and Institutions Code section 11011[5] determine the grant levels applicable to the SSP program?

2. Would an agreement by the state for federal administration of state supplemental payments violate existing state law?

Specifically, petitioners contend (1) that the prospective grant schedule proposed by the Secretary and Director was computed in disregard of the controlling statute, section 11011; (2) that no statutory authority exists which would allow the Secretary and Director to carry out their announced intention of entering into an agreement with HEW for federal administration of the SSP program commencing January 1, 1974; and (3) that California law does not permit the State Controller to draw warrants in favor of

---

[4]Contrary to respondents' contention, the organizational petitioners are proper parties to this proceeding. (*American Friends Service Committee* v. *Procunier* (1973) 33 Cal.App.3d 252, 255-256 [109 Cal.Rptr. 22.)

[5]All code references herein are to the Welfare and Institutions Code, unless otherwise specified.

HEW in payment of the state's SSP obligations under a federally administered system.

If contentions (2) and (3) above are correct, the state would have no alternative, absent the enactment (effective prior to Jan. 1, 1974) of enabling legislation which would authorize federal administration of a state SSP program, but to continue with the presently authorized system of supervision, by the State Department of Social Welfare ("SDSW"), of county administration of the program.

I. APPLICABILITY OF SECTION 11011

The Director has proposed regulations for the State Supplemental Program, upon which public hearings pursuant to Government Code section 11425 were held November 16, 1973. The SDSW regulations, Eligibility and Assistance Standards ("EAS"), commencing with EAS § 46-100, provide the following basic schedule of benefit levels:

"46-312 BENEFIT LEVELS. The individual . . . eligible to receive SSP payments shall receive an amount which when added to his . . . SSI benefit, if any, and income less allowable disregards, if any, will equal the following, as appropriate to his . . . situation:

.1 *Benefit Level for an Eligible Individual*

| If the individual is | Benefit Level |
| --- | --- |
| Aged | $221 |
| Disabled | $221 |
| Blind | $237 . . ." |

It will be recalled that the SSI is to be in the amount of $130. Therefore, absent assistance for special needs, the proposed regulations fix maximum *state* supplements under the three programs at $91 for the aged, $91 for the disabled, and $107 for the blind.[6] (EAS § 46-312.1.) HEW has, by letter dated September 26, 1973, tentatively approved the proposed benefit levels, subject to audit, as complying with the 1972 and 1973 acts.

---

[6]That the proposed SSP system would assure retention of the Medi-Cal funds appears clear in view of proposed regulation EAS § 46-312.32 which provides the following exception to the benefit levels set forth in EAS § 46-312.1: "If, because of inclusion of special need(s) allowance in an individual's December, 1973 grant, the individual's . . . SSI benefit, if any, SSP payment, and income less allowable exclusions as determined under the State Plan in effect in December 1973 is less than the total of such individual's . . . December, 1973 cash grant(s) and income, an amount equal to the difference between these sums shall be included in the Benefit Payment. This additional payment shall continue until such time as the individual's special need(s) no longer exist."

■ Petitioners and amicus contend that state law, specifically section 11011, requires higher benefit levels than those proposed in EAS § 46-312.1 —higher, in fact, than levels necessary to insure retention of the Medi-Cal benefits.[7]

Section 11011, set forth in full at footnote 3, page 447, *ante*, provides in relevant part: "If, when, and during such times as the United States government increases or decreases its contributions for any public assistance program in this state, . . . the maximum grants of aid provided in that program shall be increased or decreased by an amount equal to such increase or decrease by the United States government. It is the intent of the Legislature that any change in contributions by the United States government, whether increase or decrease, shall result in a corresponding change in the amount of the maximum grants prescribed in the public assistance program to which the increase or decrease relates.

"In no event shall this section operate to decrease the maximum grant of aid prescribed in Section 12150 [OAS] below one hundred five dollars ($105) per month, prescribed in Section 12650 [AB], below one hundred twenty-two dollars ($122) per month, or prescribed in Section 13700 [ATD] below an average grant of one hundred ($100) per month. . . ."

EAS § 44-207.11 now provides the following schedule of maximum need amounts under the existing programs, effective June 1, 1973: $217 to the blind, $195 to the disabled, and $202 to the aged.[8] To these amounts must be added the December 1973 cost of living increases of $9, $7 and $7 respectively for new totals of $226 (blind), $202 (disabled) and $209 (aged).

The maximum grants payable are set forth in EAS §§ 44-311.111 (AB), 44-311.112 (ATD) and 44-311.113 (OAS). Including the December 1973 increases, these maxima are $243 to the blind, no fixed maximum as to the disabled (average $156), and $232 to the aged. The difference between maximum need levels and maximum grants results from the inclusion in the latter of benefits paid in the event of special needs. (See, e.g., EAS §§ 44-231, 44-263, 44-269.)

The federal contribution to the maximum grant in each program is 50 percent: $121.50 for the blind, an average of $78 for the disabled, and $116

---

[7]See footnote 6, *supra*.

[8]The above-quoted figures represent the need levels for individual recipients living in their own homes. Different levels are provided in the event of shared living arrangements, non-medical board and care facilities, etc. (See, EAS §§ 44-207.12, 44-208.1.)

for the aged. Thus, on January 1, 1974, the federal government, by its repeal of titles I, X and XIV, "decreases its contributions for [the three state programs]" in those amounts.[9] Section 11011 provides in such case that "the maximum grants of aid provided in [each program] shall be . . . decreased by an amount equal to such . . . decrease by the United States government." Therefore, in order to carry out the express "intent of the Legislature that any change in contributions by the United States government . . . shall result in a corresponding change in the amount of the maximum grants prescribed in the public assistance program to which the . . . decrease" is related, the present maximum grants must be reduced by $121.50 for the blind, an average of $78 for the disabled, and $116 for the aged. Diminished by the reduction of federal participation in the form of grants-in-aid, the state maximum grants—by operation of section 11011—thus become $122[10] for the blind, an average of $100[11] for the disabled, and $116 for the aged.[12]

While the Legislature had under consideration the four bills designed to provide enabling legislation for the SSP program, the advice of the Attorney General was sought by the Director. The Attorney General at that time concluded that section 11011 was controlling and further that it required new state maximum grants at the minimum levels provided in the second paragraph of the section. The Attorney General now takes the position, however, that section 11011 is irrelevant to the computation of grants, offering neither authority nor meaningful argument in support of that position. He simply ignores section 11011 and states that the benefit levels proposed by the Secretary and Director are authorized because they comply with federal requirements. However, the real issue at this point is not whether California is in compliance with federal law, but whether, under

[9]The change in federal programs effective January 1, 1974, may alternatively be viewed as resulting in an *increase* in federal participation, in that the SSI payment of $130 exceeds the present contribution of 50 percent of the grant maxima under each of the present adult aid programs. Section 11011 operates, however, to produce new state grant maxima identical to those derived by treating the federal change as effecting a decrease.

[10]$121.50 rounded to the even dollar as provided by section 11017.

[11]The first paragraph of section 11011 operates to reduce the new average maximum grant under the ATD program to an amount below the statutory minimum provided in the second paragraph of that section, thus the statutory minimum of $100 applies.

[12]Section 11011 should operate similarly in regard to the maximum need levels, i.e., to reduce them 50 percent, thus reflecting the change (decrease) in federal participation therein.

the proposed regulations, the state would be in compliance with its own laws.[13]

Disclaiming the applicability of section 11011, the Attorney General has not submitted any calculations based thereon. The figures used by him are the sums of basic need levels plus special needs common to recipients of the respective programs ($234 for the blind, an average of $210 for the disabled, and $221 for the aged), which he compares with the proposed levels for the combined SSI-SSP totals of $237 for the blind, $221 for the disabled, and $221 for the aged (EAS § 46-312.1; see also, EAS § 46-312.32; [p. 449, *ante*]) and advances the argument that since the proposed levels in each case equal or exceed those sums, and further, comply with federal law, they are not subject to challenge.

We reject summarily the Attorney General's argument that section 11011 is inapplicable. Accordingly, we must also reject the levels proposed in EAS § 46-312.1. Simple calculation demonstrates that the proposed new levels fail to comply with section 11011: once the SSI of $130 is subtracted, each proposed state level is below the statutory requirement previously computed, i.e., $122 for the blind, an average of $100 for the disabled, and $116 for the aged (see p. 451, *ante*).

As we have previously noted, the Legislature, in section 11011 and its predecessor sections, expressly anticipated the possibility of changes in federal grant-in-aid funding; the provisions of the section are mathematical and ministerial. The first paragraph of section 11011 provides that "[i]t is the intent of the Legislature that *any* change in contributions by the United States government, whether increase or decrease, *shall* result in a corresponding change in the amount of the maximum grants prescribed in the [adult aid] program to which the increase or decrease relates." It necessarily follows that section 11011 modifies the payment provisions of each of those programs, and that the plan of the Secretary and Director to establish SSP grant levels below the amounts derived by application of section 11011 is unauthorized.

The Attorney General, on behalf of the Secretary and Director, makes at great length the additional argument that under present law any sums received by recipients in the form of payments under the federal SSI pro-

[13]Were the situation such that compliance with section 11011 would place the state out of compliance with federal law, then the section would, of course, have to yield. (See, e.g., *County of Alameda* v. *Carleson* (1971) 5 Cal.3d 730 [97 Cal. Rptr. 385, 488 P.2d 953].)

gram must be viewed as nonexempt income. From this premise, he argues that as a consequence, the $130 must be subtracted from the maximum benefit available, and therefore, the recipient's income will exceed his needs, resulting in a state supplement to him of zero. The Attorney General's interpretation (i.e., that the SSI payments are nonexempt income), would bring the statutes upon which he relies into conflict with federal law. H.R. 1 provides for the establishment and administration of a system of state *supplemental* payments. The Attorney General's claim that federal SSI payments would serve to diminish State Supplemental Payments is a clear subversion of the Congressional intent embodied in H.R. 1 to provide a floor of $130 a month which the state may supplement through participation in the SSP program.[14]

## II. FEDERAL ADMINISTRATION OF THE SSP PROGRAM

■ Under this heading we discuss whether existing state law (a) permits the Secretary and Director to enter into an agreement with HEW for federal administration of the SSP program; and (b) permits the Controller to draw warrants monthly in favor of HEW in payment of the state's SSP obligation.

Petitioners and amicus contend that both questions must be answered in the negative. The Secretary and Director, relying upon sections 10600, 10609 and 11050, and Items 275 and 280 of the Budget Act of 1973, argue that authorization for entry into an agreement for federal administration may be found in existing law. The Controller submits no argument; he alleges, however, "that, in the absence of an order of this Court or other final judgment, he will draw warrants against the State Treasury for obligations incurred pursuant to any agreement entered into by respondents Brian and Swoap for state-federal administration of the California adult aid (OAS, ATD, AB) programs after December 1974 [*sic*], if claims are duly presented for such purpose and if, after administrative review and consultation with the Attorney General, respondent Flournoy finds such claims to be legally payable from the appropriations made by Welfare and Institutions Code sections 15201, 15202, and 15204."

Federal law allows a state which elects to supplement the SSI payments with an SSP program to choose whether it will retain control over the administration of such supplements or whether it shall delegate that responsibility to HEW. (Act of Oct. 30, 1972, Pub.L. No. 92-603, § 301, 86 Stat. 1465, 1474-1475; Act of July 9, 1973, Pub.L. No. 93-66, § 212(b), 87 Stat. 155, 156-157.)

---

[14]See footnote 2, *ante*, page 446.

■

The entire body of California's welfare law provides for county administration alone. Section 10800 provides that "the administration of public social services in each of the several counties of the state is hereby declared to be a county function and responsibility and therefore rests upon the board of supervisors in the respective counties . . . [¶] . . . [who] shall establish a county department [which] shall be the county agency for the administration of public social services . . . ."[15] SDSW retains, however, certain controls over county administration. (See, e.g., §§ 10605, 10804, 11050.)

The relevant appropriations statutes appropriate funds *to the counties* to reimburse them for aid payments in an amount equal to those payments made by the county under the respective aid programs. (§§ 15201, 15202, 15204.)

Section 11050, upon which the Secretary and Director rely most heavily to support their claim that the proposed agreement is lawful, authorizes SDSW to contract with any county for the performance of eligibility and grant determinations, and further provides that in the absence of such contract ". . . [SDSW] may act in the place of the county and assume direct responsibility for the administration of such eligibility and grant determinations." Under the authority of section 11050, SDSW proposes to take over statewide administration of the adult aid programs, and further, to recommend to the Director of Finance that the administrative cost funds appropriated by Item 280 of the Budget Act of 1973 be transferred to the support budget of SDSW. Item 280 provides ". . . that [SDSW] may act in the place of any county and assume direct responsibility for the administration of eligibility and grant determination . . . in the absence of a contract as provided in section 11050. . . . Upon recommendation of the Director of Social Welfare, the Director of Finance may authorize the transfer of funds to Item 275 [the SDSW support budget] for this purpose. . . ."

The Secretary and Director conclude that the foregoing authorities authorize SDSW, acting in the place of the counties, (1) to exercise the eligibility and grant functions delegated to the counties, and (2) "to expend the appropriations made to the counties for the maintaining of the aged (§ 15201), the blind (§ 15202) and the disabled (§ 15204)."

---

[15](See also, §§ 10001, 10058, 10604–10606, 10615, 10802–10804, 10809, 11004, 11013, 11050, 11055, 11102, 12001, 12007, 12012, 12015, 12058, 12101.1, 12158, 12200, 12506, 12509–12510, 12559–12560, 12700–12702, 13556, 13750, 15000, 15100, 15150–15153, 15201–15202, and 15204.)

The cited authorities confer no such total power upon SDSW. Section 11050 makes no reference on its face to federal administration.[16] The section does not furnish a statutory blank check for administrative obliteration of county functions. Rather it is designed to assure statewide uniformity in eligibility and grant determinations by authorizing state assumption of these limited functions in an individual county whose welfare policies are contrary to statewide standards. (See §§ 10605, 10615.)

Nor may SDSW, following an assumption of statewide administration, thereafter—under the claimed authority of sections 10600 and 10609—delegate to the federal government the payment functions in the adult aid programs, together with all administrative responsibility for the programs. Those sections provide as follows: "It is hereby declared that provision for public social services in this code is a matter of statewide concern. The State Department of Social Welfare is hereby designated as the single state agency with full power to supervise every phase of the administration of aid and the State Department of Health is hereby designated as the single state agency with full power to supervise every phase of the administration of services for which grants-in-aid are received from the United States government or made by the state in order to secure full compliance with the applicable provisions of state and federal laws." (§ 10600.)

"The department may act as the agent or representative of or cooperate with the federal government in any matters within the scope of the functions of the department, for the administration of federal funds granted to this state or for any other purpose in furtherance of those functions.

[16]It is interesting to note that the recent legislative history of section 11050 also casts doubt on the contention of the Secretary and Direcor that the section supports the argument for federal administration. Immediately after the exhaustive welfare reform negotiations of July 1971 between the Legislative and Executive branches of government, the two concluding paragraphs of the proposed amendment to section 11050 read as follows:

"The Department may also contract with the federal government for either the federal government to administer California welfare programs, or for the department to administer federal welfare programs.

"The Department shall have the right to terminate any such contract immediately if the contracting county or the federal government fails to carry out its contractual obligations." (SB 796, § 23, as amended in Assembly, August 5, 1971.)

On August 10, 1971, SB 796 was amended for the last time. The first of the two paragraphs quoted above was stricken in its entirety; the reference to the federal government in the second paragraph was also stricken. (See *Rich* v. *State Board of Optometry* (1965) 235 Cal.App.2d 591, 607 [45 Cal.Rptr. 512]; see also, Willard and MacDonald, *The Effect of an Unsuccessful Attempt to Amend a Statute* (1958) 44 Cornell L. Q. 336, 341.)

"Any contract or agreement entered into by the department with the federal government or any agency thereof for the expenditure of any funds in the exercise of any power granted to the department by this section shall be subject to approval by the State Department of Finance." (§ 10609.)

Under no rational interpretation of the two sections is SDSW given the plenary power it seeks to assert.

Accordingly, we reject the view of the Secretary and Director that sections 11050, 10600 and 10609 authorize transfer to the federal government of the state and counties' responsibility for the administration of California welfare programs; any such agreement would be invalid. As this court stated in *Pac. Inter-Club Yacht Assn.* v. *Richards* (1961) 192 Cal.App.2d 616, at page 619 [13 Cal.Rptr. 730]: "It is well established that all contracts entered into by the state, or its agencies, must be authorized by statute . . . and all such unauthorized agreements and contracts are null and void." The Secretary and Director are therefore without authority to yield administration of the state adult aid programs to the federal government.

From what has been said above, it is clear also that the Controller lacks authority to pay to HEW state funds (in an amount equal to the anticipated SSP obligation) for administration in the program. "No money shall be drawn from the Treasury but in consequence of appropriation made by law, and upon warrants duly drawn thereon by the Controller." (Cal. Const., art. XIII, § 21.)

III. IMPLEMENTATION OF THIS DECISION

Although we have concluded that petitioners' claims must be sustained, we cannot accede to their request, made for the first time at oral argument, that in the event of a decision favorable to them, we fashion an order delaying the effective date of that part of our decision which prohibits the payment by the Controller of state funds to HEW, and the execution by the Secretary and Director of an agreement for federal administration. Specifically, their request is that we allow the proposed implementation of federal administration during the period January-February 1974 as an interim measure. Courts are powerless to allow, even temporarily, unlawful

conduct by litigants—least of all, public officers.[17] The scope of equitable relief is not limitless; once the contemplated actions of respondents are held invalid—and in the case of respondent Controller also violative of the California Constitution—the judicial role ends.

Let the peremptory writ issue as prayed.

Friedman, Acting P. J., and Regan, J., concurred.

A petition for a rehearing was denied on November 30, 1973, and the following opinion was then rendered:

THE COURT.—Respondents Secretary and Director have filed a petition for rehearing and petitioners have filed a reply. Notwithstanding the care taken by this court to distinguish between the basic grants payable to recipients without special needs and the maximum grants payable to those with special needs (*ante*, p. 450), the petitioners evince the erroneous belief that commencing January 1974, *all* recipients in the affected programs will receive maximum grants, i.e., the amounts payable to those with special needs, minus the former federal contribution. No change in law has abolished the distinction between the benefit levels applicable to those with special needs and to those without. To place the matter beyond all doubt, let us express it thusly: In January 1974, a recipient will receive, from the state-county system, a grant equal in amount to one-half of that which he would have received had H.R. 1 not been enacted.

---

[17] Authorities cited by the Attorney General in his letter of response to (and in qualified support of) the request voiced by petitioners are inapplicable to transactions involving the execution of government contracts and the disbursements of public funds. (See *Legislature* v. *Reinecke* (1972) 6 Cal.3d 595 [99 Cal.Rptr. 481, 492 P.2d 385]; *Serrano* v. *Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187]; *Silver* v. *Reagan* (1967) 67 Cal.2d 452 [62 Cal.Rptr. 424, 432 P.2d 26].)