[Civ. No. 16033. Third Dist. June 10, 1977.]

LEE N. DRISKILL, Plaintiff and Appellant, v.
MARION J. WOODS, as Director, etc., Defendant and Respondent.

### Counsel

Frank Ochoa, Jr., Rudolfo C. Aros, Loren Mitchell and Casey S. McKeever for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, N. Eugene Hill and John J. Klee, Jr., Assistant Attorneys General, Edmund E. White, Elisabeth C. Brandt and Thomas E. Warriner, Deputy Attorneys General, for Defendant and Respondent.

### Opinion

**PARAS, J.—** ■  Plaintiff, a 35-year-old man afflicted with quadriplegia, appeals from a judgment denying his petition for writ of mandate in which he sought to compel the California Department of Benefit Payments (hereinafter Department) to pay him retroactive benefits for attendant care services.

Plaintiff is capable of managing his own legal, financial, personal and business affairs, except that he needs a full-time attendant to provide

him with ordinary housekeeping services and other in-home supportive services such as assistance in dressing, getting into and out of bed, eating, and performing bodily functions.

Beginning on November 1, 1973, and in accordance with statutes then in effect, the County of Yolo contracted with an attendant care provider, Mrs. Rita Hamm, to perform these services for plaintiff on a full-time, live-in basis. Under the contract, the County of Yolo paid Mrs. Hamm $230 per month for the months of November 1973 through February 1974. At the time of plaintiff's regular quarterly reevaluation of need, this rate was renegotiated to $300 per month for the months of March through May 1974.

On December 5, 1973, the Governor signed into law Assembly Bill No. 134, which included section 12000 et seq. of the California Welfare and Institutions Code, as part of a massive changeover of most of the state categorical aid programs to a federally administered Supplemental Security Income/State Supplemental Payment Program.[1] Assembly Bill No. 134 was enacted as urgency legislation, effective when signed, and operative on January 1, 1974. The particular statute involved in this litigation, Welfare and Institutions Code section 12304, was subsequently amended by Assembly Bill No. 853 (Stats. 1974, ch. 75, § 17, p. 171), effective March 14, 1974, which amendment stated that it "shall apply retroactively to January 1, 1974, to the extent that it may legally do so." Both parties herein have premised their arguments and contentions upon the amended version, treating it as alone applicable to the issues; we shall dispose of the case in accordance with such treatment.

Section 12304, as amended, provides that an individual eligible for attendant care "who is capable of handling his own financial and legal affairs shall be given the option of hiring and paying his own provider of in-home supportive services. For this purpose such individual shall be entitled to receive a monthly cash payment in advance not to exceed [$450] . . . which is in addition to his grant, if any." (§ 12304, subd. (b).)

[1] Effective January 1, 1974, pursuant to Public Law No. 92-603, 86 Stat. 1329, the federal government ended the previously existing system of federal participation in adult welfare programs under the Social Security Act, including the aid to the totally disabled program found in title XIV thereof. (42 U.S.C. § 1351 et seq.) Public Law No. 92-603 replaced these programs with one federally administered program of aid under title XVI of the Social Security Act. The federal program is composed of two portions, the federal share (supplemental security income, or SSI) and the state supplement (state supplemental payment, or SSP). The entire program is commonly known as SSI/SSP. See California League of Senior Citizens, Inc. v. Brian (1973) 35 Cal.App.3d 443, 445-447 [110 Cal.Rptr. 809], for a general description of the program changeover.

State regulations implementing section 12304 were distributed by the Department to the counties on April 1, 1974 (Manual of Policies and Procedures § 30-500.5). On June 1, 1974, Yolo County again conducted a regular quarterly reevaluation of plaintiff's need for services. Pursuant to the regulations received from the state, it then determined that plaintiff was eligible for the $450 maximum with which to hire and pay his own attendant. Plaintiff hired Mrs. Hamm.

In the meantime, on May 6, 1974, plaintiff had filed a request for a "fair hearing," contending that he had had the right, since January 1, 1974, to select, hire, and pay his own attendant pursuant to the new section 12304. After plaintiff had already been granted such right prospectively, the hearing was held on June 3, 1974. It was necessarily limited to benefits for the period January 1, 1974 to May 31, 1974. The hearing examiner's decision, which was adopted by the Department on August 10, 1974, concluded that plaintiff was not entitled to retroactive payment for the first five months of 1974 of the difference between the amount actually paid Mrs. Hamm and the $450 maximum allowable.

Plaintiff acknowledges that the money he seeks is to pay for attendant care services which have already been fully rendered by Mrs. Hamm under contract with the county. He concedes the obvious, that there is no way that those services can be reperformed, or more important, performed more fully or satisfactorily. But he relies on this court's opinion in *Leach* v. *Swoap* (1973) 35 Cal.App.3d 685 [110 Cal.Rptr. 62], which extended retroactivity to money grants for attendant care services. *Leach* essentially holds that "the dual concept of debt and public policy" require retroactive payment of any such moneys as have been wrongfully withheld, irrespective of whether they can still be used for the purpose intended. We quote extensively from that opinion: "[T]he Director argues that unlike basic 'money payment' aid, services (such as attendant care) if not rendered at the time they are needed are irretrievably lost (e.g., a bath not taken because of lack of assistance can never be made up for at a later time). In other words, the Director is arguing that *services cannot be retroactively purchased.*

"Although the distinction drawn by the Director is superficially accurate, we think it misses the point. Because a money grant is authorized under specified circumstances for attendant care services does not make those payments any less 'aid' [fn. omitted]. Secondly, the Director's argument could be made equally applicable to the basic grant

(e.g., a hamburger not eaten can never be made up for at a later time by eating two, three or more).

"................

"Support is found in the decisional law. In *Bd. of Soc. Welfare* v. *County of L. A.* (1945) 27 Cal.2d 81 [162 P.2d 638 (630)], . . . [t]he county argued that such payments would be constitutionally improper (i.e., a gift of public money) absent a finding of 'present need.' The court rejected this argument, stating (at pp. 85-86): 'In the case now before us we are of the view that the provisions for appeal to the State Social Welfare Board and for "the payments, if awarded, to commence from the date the applicant was first entitled thereto" likewise subserve a clear public purpose by securing to those entitled to aid the full payment thereof "from the date . . . [they were] first entitled thereto" regardless of errors or delays by local authorities. . . . The obligation to pay became a debt due from the county to the applicant as of the date the latter was first entitled to receive the aid. [Citation.] The bare fact that an applicant has by one means or another managed to ward off starvation pending receipt of the payments to which he was previously entitled provides no sufficient excuse for a county to refuse to make such payments. To hold otherwise would, as suggested by petitioner herein, provide a money-saving device for the counties at the expense of those of our citizenry least able to bear the burden thereof.' [Citations.]

"In *Mooney* v. *Pickett, supra,* 26 Cal.App.3d at page 435 [102 Cal.Rptr. 708], the court, relying upon an earlier case of the same name, *Mooney* v. *Pickett* (1971) 4 Cal.3d 669 [94 Cal.Rptr. 279, 483 P.2d 1231], and *Bd. of Soc. Welfare, supra,* recognized and applied the dual concept of *debt* and *public policy,* and stated: 'In *Mooney* v. *Pickett, supra,* the Supreme Court stressed that section 17000 of the Welfare and Institutions Code, pursuant to which appellant sought General Assistance, "imposes a mandatory duty upon the counties to support 'all competent, poor, indigent persons, and those incapacitated by age, disease, or accident.' " (*Id.,* at p. 676.) Consequently, the obligation to provide appellant with general assistance became a debt due from the county as of the date he was first entitled thereto. By requiring such retroactive payments to be made by the county, the public policy of securing to those entitled to aid the full payment thereof, from the date they were first entitled thereto, regardless of errors and delays by local authorities, is promoted.' " (Italics added.) (*Leach* v. *Swoap, supra,* 35 Cal.App.3d at pp. 688-690.)

Neither the "debt" concept nor the "public policy" concept is applicable in the present case, however. Unlike *Leach* and its predecessors, the plaintiff here was deprived of nothing during the five-month period. At the very most, he was denied an abstraction, the option to receive his benefits in a manner mechanically different from that actually employed. His argument then is not that he was deprived of services he should have received, nor that the quality of the services received was substandard, but that because of the method by which they were provided, those services cost the public too little and should now be made retroactively more expensive. The proffered way to accomplish this is by giving plaintiff a sum of money to which he is not otherwise entitled.

Merely to state the argument is to demonstrate its absurdity. It is not the plaintiff, but Mrs. Hamm who suffered by the delay in implementation. She, however, is neither a party to this action nor a person entitled to receive benefits under section 12304. Moreover, her contractual agreement with the county to work for $230 and $300 per month would foreclose her from seeking additional amounts.[2]

Plaintiff's argument might have merit if he were entitled to attendant care *plus* a net cash surplus. But his brief specifically disavows such an argument; and in any case the March 14, 1976, amendment to section 12304 forecloses it by providing that recipients who hire their own attendants "shall be eligible to receive *services* under this article, the total cost of which does not exceed four hundred fifty dolars ($450) per month . . . ." (Italics added.) (Stats. 1974, ch. 75.)

The judgment is affirmed.

Puglia, P. J., concurred.

---

[2]We note in passing that the Department did not unreasonably delay implementation of section 12304. The circumstances of this case are unique. It will be recalled that four legislative bills implementing the new federal program had failed of passage during the regular session of the somewhat ambivalent and stormy 1973 Legislature, and that the Department had therefore determined itself to implement the federal program by its own regulations (see *California League of Senior Citizens, Inc.* v. *Brian, supra,* 35 Cal.App.3d at pp. 447-448). The emergency legislation came about as a result of a frantic legislative scramble following the *Brian* decision of November 16, 1973, which held such proposed regulations invalid. There was thus no way for the Department to anticipate the original version of section 12304 and prepare regulations in advance of December 5, 1973. Thereafter the amendment of section 12304 was in the legislative mill until March 1974. The regulations implementing section 12304 as amended were distributed by the department to the counties on April 1, 1974, which was certainly not dilatory. Similarly it was not unreasonable to allow the counties 60 more days to acquaint themselves with and act upon the statute and regulations.

**REYNOSO, J.**—I respectfully dissent.

The issue posed is whether the denial of retroactive benefits to plaintiff is contrary to the direction of Welfare and Institutions Code section 12304. I conclude that it is. My conclusion is buttressed by the dual concept of (1) debt and (2) public policy developed in *Leach* v. *Swoap* (1973) 35 Cal.App.3d 685 [110 Cal.Rptr. 62].

I

The *Leach* court accepts the concept of "debt" as articulated by our Supreme Court in *Bd. of Soc. Welfare* v. *County of L. A.* (1945) 27 Cal.2d 81, 86 [162 P.2d 630]: "The obligation to pay became a *debt due* from the county to the applicant as of the date the latter was *first entitled* to receive aid." (Italics added.) Thus, we are not to look at how plaintiff weathered the conditions at the time he was being denied benefits. Rather, we must explore the issue of when he became entitled to the benefits.

In examining entitlement, we must first determine when section 12304, under which plaintiff makes his claim, became operative. Assembly Bill No. 853, which refers to section 12304, among others,[1] provides: "This act shall apply retroactively to January 1, 1974, to the extent that it may legally do so." Thus, January 1 is the earliest time a debt could exist under this new statute.

While the statute was to be effective on January 1, 1974, no debt can arise without the existence of an applicant entitled to receive aid. That is, a person to whom the debt is owing. Was plaintiff such an applicant on January 1, 1974? He was. Plaintiff was at all times known to the welfare authorities as a severely impaired person. Apparently, he had been institutionalized as a result of his severe impairment. Nothing in the record would lead to the conclusion that he was not as impaired on January 1, 1974, as in May 1974, when a formal determination was made of such impairment. Indeed, from the record it appears that plaintiff was receiving the maximum level of service before May although the reimbursement for his service provider was not at the maximum level allowed by the statute. Section 12304, subdivision (d) *requires* the county

---

[1] Assembly Bill No. 853 was preceded by Assembly Bill No. 134 which was effective on December 5, 1973, and operative on January 1, 1974. The statutes were essentially the same except that Assembly Bill No. 853 clarifies the legislative intent that eligible persons were only to receive services and not services plus cash payments. Both statutes, however, set a maximum benefit level of $450 per month.

welfare department to "inform in writing any individual who is potentially eligible for services under this section of his right to such services." Plaintiff is clearly such a person yet no notification was sent. For purposes of section 12304 benefits, plaintiff must be treated as an applicant[2] as of January 1, 1974.

Since by legislative fiat a benefit was extended as of January 1, 1974, and since plaintiff must be treated as an applicant the "debt" arose on that date.

## II

The public policy concept developed in *Leach* was embraced by the Supreme Court in *Tripp* v. *Swoap* (1976) 17 Cal.3d 671, 683 [131 Cal.Rptr. 789, 552 P.2d 749]. There the Supreme Court in discussing the earlier case of *Bd. of Soc. Welfare* v. *County of L. A., supra,* 27 Cal.2d 81, explained: "[W]e recognized the strong public policy in favor of retroactive payment of welfare benefits. (*Id.,* at pp. 85-86.) This policy has been articulated as 'securing to those entitled to aid the full payment thereof, from the date they were first entitled thereto, regardless of errors and delays by local authorities . . . .' (*Mooney* v. *Pickett, supra,* 26 Cal.App.3d at p. 435.)" The quoted public policy concept has two ingredients: (1) The effort to make the recipient as whole as possible, and (2) the effort to discourage governmental delays. Both ingredients apply.

First, plaintiff will be made whole by retroactive payment. An employer, as plaintiff is now considered, will generally receive better service if the earnings of his employee, the service provider, are at an acceptable level and if the employee perceives that the employer is trying to do what is just.

Second, defendant's explanations for the lack of retroactivity are confused and unpersuasive. Defendants urge the view that delay in implementing the statute was reasonable in light of the complex task of drafting regulations. The argument misses the mark. Defendant's hearing officer ruled against plaintiff on the basis that the state regulations did not make the benefits retroactive. The real issue, of course, is

---

[2]The usual application of the debt doctrine involves an existing benefit. The existence of that benefit does not create the debt. It is only when a person applies for the benefit and is wrongfully denied that the debt arises. This cause poses a situation wherein the benefit is new. Only in the restricted factual situation in which a person is already a recipient and the Legislature intends to give further or different assistance to the recipient can the debt doctrine apply when dealing with new legislation.

whether defendant's regulation should have made the benefits retroactive. In view of the explicit terms of the statute, I find such a failure unexplainable. Such delays in implementing benefits cannot be countenanced under the public policy concept by which I am bound. The county welfare officials implemented the new benefits in what appears to be a customarily lethargic manner. It is the state official, defendant, who failed to issue regulations in conformity with the clear mandate of the statute.

The debt and public policy considerations compel the conclusion that plaintiff is entitled to the difference between what he received and the maximum rate for the months of January to May 1974. I would so hold. However, the statute does not contemplate a windfall. Plaintiff is obligated to hold the money in trust for the in-home service provider, the exclusive monetary beneficiary. Payment should be made in accordance with government requirements. Funds not paid to the provider within a reasonable time revert to the appropriate governmental agency.[3]

Appellant's petition for a hearing by the Supreme Court was denied August 4, 1977.

---

[3]While the record is silent, I understand that current regulations would proscribe a windfall in that the "basic grant" would be reduced by any amount incorrectly withheld by plaintiff.