[Civ. No. 20623. Fourth Dist., Div. Two. Aug. 24, 1979.]

AIR QUALITY PRODUCTS, INC., Plaintiff and Appellant, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents.

COUNSEL

Fadem, Berger & Norton and Michael M. Berger for Plaintiff and Appellant.

George Deukmejian, Attorney General, R. H. Connett, Assistant Attorney General, Walter E. Wunderlich, Joel S. Moskowitz and Michael Strumwasser, Deputy Attorneys General, for Defendants and Respondents.

OPINION

KAUFMAN, Acting P. J.—Plaintiff Air Quality Products, Inc. appeals from an order of dismissal with prejudice entered after the trial court sustained the demurrer of defendant State Air Resources Board without leave to amend.

## Facts

On November 1, 1973, Air Quality Products, Inc. (Air Quality) filed a complaint against the State Air Resources Board (Board) and the State of

California seeking damages of $52 million. The complaint alleged that Board improperly accredited and authorized installation of General Motors Corporation retrofit exhaust emission control devices for use in California motor vehicles, causing monetary loss to Air Quality, which had previously developed, received Board accreditation for and, accordingly, made contractual commitments for the manufacture of its own exhaust device.

On April 27, 1978, the Attorney General, acting as attorney for both defendants, Board and the State of California, filed a motion to dismiss the action for failure to bring it to trial within two years after the complaint was filed (Code Civ. Proc., § 583, subd. (a)), a motion to dismiss the action for failure to serve and return the summons on the complaint within three years after the complaint was filed (Code Civ. Proc., § 581a), and a demurrer to the complaint. On June 9, 1978, the trial court granted the motion to dismiss for failure to timely serve and return the summons as to the state, but denied the motion as to Board,[1] leaving Board the sole defendant. The demurrer was not then heard, as Air Quality filed an amended complaint on the same date.

The amended complaint, consisting of two counts, was substantially the same as the complaint, though the amount of damages sought was reduced to $3 million. The allegations of the first count are as follows. Air Quality is a California corporation with its principal place of business in Orange County, engaging in inventing, distributing, installing and servicing exhaust emission controls for addition to used cars to combat air pollution. The state enacted the Pure Air Act of 1968 (Motor Vehicle Pollution Control)[2] in order to curb air pollution resulting from the exhaust emissions of motor vehicles, including emissions from older cars manufactured without the appropriate controls. The act made mandatory installation of exhaust emission control devices, thereby "guaranteeing a market" in order to "induce" private industry to invest in, develop and produce exhaust devices. Board[3] publicized the inducements of the act,

---

[1] Board sought mandate in this court to compel the trial court to dismiss the action for failure to timely serve Board and return the summons. We denied the writ. (*State Air Resources Board* v. *Superior Court*, 93 Cal.App.3d 803 [155 Cal.Rptr. 726].)

[2] Health and Safety Code sections 39080 et seq. (Stats. 1968, ch. 764, pp. 1467-1486), the code provisions originally constituting the act, were subsequently repealed and reenacted in Health and Safety Code sections 43000 et seq. (Vehicular Air Pollution Control).

[3] See Health and Safety Code sections 39002, 39018, 39019, 39053, 39500 et seq., 43009 et seq.; California Administrative Code, title 13, section 1900 et seq. setting forth the authority of the Board.

and actively encouraged private industry, including Air Quality, to develop exhaust controls. The act requires, inter alia, that in all nonexempt cars manufactured between 1955-1965 exhaust devices approved by the Board be installed upon initial registration or resale and registration. (See Health & Saf. Code, §§ 43600 et seq., 43652.) The act and administrative regulations set forth the applicable procedures, including testing, for approval of the devices. To receive Board accreditation, a device must "be designed so as to have no adverse effect on engine operation or vehicle performance. . . ." (Cal. Admin. Code, tit. 13, § 2002.)

Air Quality developed a device called the "Pure Air System," which controls exhaust emissions as required by the act and regulations, with no adverse effect on engine operation or vehicle performance. In November 1971, after testing the Pure Power System, Board approved the device as meeting the act's requirements for installation in 1955-1965 vehicles. At this time, no other device meeting the act's requirements had been submitted to Board. "In reliance" on Board's approval of the device, Air Quality contracted with Northrop Corporation to produce 500 production prototypes for submission to Board for testing and approval, at a contract price in excess of $125,000.

Prior to 1972, General Motors Corporation (GM) developed an exhaust device. GM did not submit it to Board because GM knew the device did not meet the statutory and regulatory standards. For instance, its installation would impair engine operation and vehicle performance.

Board, instead of setting a date for mandatory installation of Air Quality's device, requested that GM submit its device for testing and approval. After submission of the GM device, Board found it increased fuel consumption by 10 percent, and caused burning of exhaust pipes, requiring early replacement. Notwithstanding the Board's findings, it approved the GM device for installation in 1955-1965 cars.

The GM device costs less to produce than the Pure Power System, and can be offered for sale at one-third of the latter's price. Since the great majority of automobile owners would buy the less expensive device, as a result of Board's approval of the GM device, Air Quality's device could only be sold to owners of 1955-1965 cars on which the GM device could not be installed.

In approving the GM device, Board required a 14 to 1 air-to-fuel ratio in each car's carburetor to achieve the requisite carbon monoxide level of 1.5 percent.[4] It is impossible, however, to comply with these requirements in about 15 percent of 1955-1965 automobiles having "sufficiently worn" carburetors. In April 1972, Board told Air Quality it would require installation of the Pure Power System in 15 percent of 1955-1965 cars if Air Quality: had available by September 1972 enough devices for 15 percent of the cars expected to be transferred; warranted performance of the device; trained servicemen at local installation stations to install and service the device; and had sufficient financial resources to meet production, service and warranty commitments. Board also required a corporate guarantee and guarantees of principal shareholders of Air Quality's performance. Air Quality met each of Board's requirements, reasonably relying on Board's "inducements" to Air Quality to produce the Pure Power System, which Board would require to be installed in 15 percent of 1955-1965 vehicles.

After Air Quality "had Northrop produce" 90,000 devices at a cost of $2 million, Board changed its requirements for installation of the GM device, repudiating the representations on which Air Quality relied, by "waiver" of the requirement of the 14 to 1 air-to-fuel ratio, or the 1.5 percent carbon monoxide level. As a result, the GM device could be used on all 1955-1965 vehicles. In July 1976, Northrop obtained a $1,009,000 judgment against Air Quality, representing the unpaid balance of the cost of Northrop's production of the Pure Power System devices.

On the first count of the amended complaint, Air Quality seeks damages in excess of $3 million.

In the second count Air Quality claims that it obtained a "vested property right" when Board, in accordance with the act, approved the Pure Air System, giving Air Quality "an interest in the sale of emission control systems for '55-'65 cars, subject only to competition from others who met the standards of the Board." In approving the GM device that did not satisfy the requirements of the act, "Board took and damaged Air Quality's vested property right without compensation, in violation of Cal. Const., art I, § 19."

---

[4]The current requirement specifies 2 percent as the maximum permissible carbon monoxide exhaust emission. (Health & Saf. Code, § 43602.)

Board demurred to the amended complaint, asserting inter alia, that (1) Board is not a suable public entity; (2) Board is immune from tort liability pursuant to Government Code sections 818.4 (issuance, denial, suspension or revocation of permit, license, certificate, approval or similar authorization) and 818.2 (adoption or failure to adopt or enforce enactment); (3) Air Quality has not pleaded facts sufficient to state a cause of action for inverse condemnation against Board; (4) Air Quality has not pleaded facts sufficient to state a cause of action against Board for breach of either an express or implied contract; (5) Air Quality has not pleaded facts sufficient to state a cause of action based on estoppel; and (6) Air Quality has failed to join GM, an indispensable party.

The trial court sustained Board's demurrer on grounds of "defect of parties," stating that Board "is not an independent existing entity. It isn't a state; it is an agency of the State and part of the State. And I don't understand how Board can be sued if the State has been dismissed because the Board is the State." The court expressly refrained from consideration of the other grounds of the demurrer. The court's "Order of Dismissal After Sustaining General Demurrer Without Leave To Amend" was subsequently filed, dismissing the action with prejudice pursuant to Code of Civil Procedure section 581, subdivision 3. This appeal followed.

On appeal Air Quality contends the court erred in sustaining the demurrer on the ground of defect of parties, and additionally asserts that the facts pleaded state causes of action for breach of contract and inverse condemnation.

*Discussion*

Code of Civil Procedure section 430.10 authorizes a party to object by demurrer to the complaint based, inter alia, upon "a defect . . . of parties" or failure to "state facts sufficient to constitute a cause of action." ■ A demurrer necessarily constitutes an admission of the material and issuable facts properly pleaded in the complaint, but does not admit the contentions, deductions, or conclusions of fact or law. Notwithstanding facts unclearly stated, lack of precise form or language, insertion of irrelevant facts and requests for inappropriate relief, the rule is that if, upon consideration of all the facts therein stated, liberally construed, it appears plaintiff is entitled to any judicial relief against defendant, the complaint will withstand the demurrer. (*Glaire* v. *La*

*Lanne-Paris Health Spa, Inc.,* 12 Cal.3d 915, 918 [117 Cal.Rptr. 541, 528 P.2d 357]; *Scott* v. *City of Indian Wells,* 6 Cal.3d 541, 549 [99 Cal.Rptr. 745, 492 P.2d 1137]; *Daar* v. *Yellow Cab Co.,* 67 Cal.2d 695, 713 [63 Cal.Rptr. 724, 433 P.2d 732].) However, "[i]f a complaint is insufficient on any ground properly specified in a demurrer, an order sustaining the demurrer must be upheld even though the particular ground upon which the court sustained it may be untenable." (*Irwin* v. *City of Manhattan Beach,* 65 Cal.2d 13, 20 [51 Cal.Rptr. 881, 415 P.2d 769]; see *Ramos* v. *County of Madera,* 4 Cal.3d 685, 692, fn. 6 [94 Cal.Rptr. 421, 484 P.2d 93].)

■ We conclude that Air Quality has failed to plead facts sufficient to state a cause of action, and that, therefore, the trial court properly sustained Board's demurrer. We find it unnecessary to discuss many of the questions debated by the parties.

*Contract Theory*

Whether or not Air Quality relies on an implied-in-fact contract theory as well as promissory estoppel is unclear. Its primary reliance is upon the so-called doctrine of promissory estoppel embodied in Restatement of Contracts, section 90: "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."[5] (See *Raedeke* v. *Gibraltar Sav. & Loan Assn.,* 10 Cal.3d 665, 672 [111 Cal.Rptr. 693, 517 P.2d 1157]; *Youngman* v. *Nevada Irrigation Dist.,* 70 Cal.2d 240, 249-250 [74 Cal.Rptr. 398, 449 P.2d 462].)

In any event, Air Quality's factual contentions are not in question. First, Board "actively publicized" the "promise" of the Clean Air Act, intended by the Legislature to "guarantee a market so that private industry would develop [exhaust devices]," thereby encouraging Air Quality and others to develop the devices. "Air Quality detrimentally relied on this initial promise by spending more than $300,000 to develop the Pure Power System," which was "worthless" without Board's requir-

---

[5]In the current proposed Restatement Second of Contracts (Tent. Drafts Nos. 1-7 (1973)) section 90, slightly reworded, reads: "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires."

ing installation in the "market promised." Second, after approving the device, Board told Air Quality, then the only company with an approved device, that a date would be set for "mandatory installation of an approved device." Air Quality detrimentally relied on this promise by contracting with Northrop for the production of 500 prototypes at a cost of $125,000. And third, after conditionally approving the GM device, to take 85 percent of the market from Air Quality, Board assured Air Quality of access to the remaining 15 percent of the market if it met certain conditions. In order to meet these conditions, Air Quality contracted with Northrop for production of 90,000 Pure Power Systems at a cost of $2 million, constituting the detrimental reliance. The Board "reneged" on its "15% promise."

■ Although the Attorney General apparently would argue to the contrary, we have no doubt that a public agency may be found liable in appropriate circumstances on the basis of either an implied-in-fact contract or the doctrine of promissory estoppel (see *Youngman* v. *Nevada Irrigation Dist., supra,* 70 Cal.2d at pp. 246, 249-251; *Hilltop Properties* v. *State of California,* 233 Cal.App.2d 349, 362-365 [43 Cal.Rptr. 605, 37 A.L.R.3d 109].) ■ However, no contractual obligation may be enforced against a public agency unless it appears the agency was authorized by the Constitution or statute to incur the obligation; a contract entered into by a governmental entity without the requisite constitutional or statutory authority is void and unenforceable. *(California League of Senior Citizens, Inc.* v. *Brian,* 35 Cal.App.3d 443, 456 [110 Cal.Rptr. 809]; *Gonzales* v. *State of California,* 29 Cal.App.3d 585, 593 [105 Cal.Rptr. 804]; *Hilltop Properties* v. *State of California, supra,* 233 Cal.App.2d at p. 366; *Pac. Inter-Club Yacht Assn.* v. *Richards,* 192 Cal.App.2d 616, 619 [13 Cal.Rptr. 730]; see Cal. Const., art. IV, § 17.)

■ Air Quality does not point to nor are we aware of any constitutional or statutory authority for Board to enter into a contract with a firm binding itself to compel the installation of that firm's exhaust emission device on vehicles operated in California or binding itself not to change its standards or not to reconsider decisions previously made. Health and Safety Code section 39603, subd. (a) authorizes Board to "contract for technical advisory services and other services as may be necessary for the performance of its powers and duties." The contract asserted by Air Quality, however, is not one for services to the Board necessary for the performance of its powers and duties. Pursuant to Health and Safety Code section 39703 Board may "[a]ward contracts for

air pollution research projects." However, the contract asserted by Air Quality in the case at bench can hardly be said to fall under that classification. Health and Safety Code section 39600 authorizes Board to "do such acts as may be necessary for the proper execution of the powers and duties granted to, and imposed upon, [it] by this division and by any other provision of law." We cannot, however, read into that general grant of power the authority for Board to enter into a contract with one specific company binding itself to compel the installation of that company's exhaust emission device in vehicles in California or binding itself not to change its standards or previous decisions. In the first place, the express authorization in the statute for the Board to enter into certain types of contracts suggests that had the Legislature intended the Board to have the general contractual authority argued for, the statute would expressly so provide. Secondly, the authority to enter into such a contract would be inconsistent with the statutory scheme in which the Board is to develop standards and certification procedures for emission control devices and encourage competition among the manufacturers of accredited devices. Of particular note in this regard is Health and Safety Code section 43640 et seq. which authorizes Board to revoke, suspend or restrict certification of a previously certified device.

Air Quality's reliance upon *Youngman* v. *Nevada Irrigation Dist., supra,* 70 Cal.2d 240, is unwarranted. The court there found authority for an implied contract by the district based on a specific statutory grant of contractual authority and the necessary incidents thereto.[6] (70 Cal.2d at p. 248.)

Thus, even assuming the facts pleaded by Air Quality establish prima facie all the other elements necessary to a cause of action based on implied contract or promissory estoppel, no contractual liability may be assessed against Board on account of the "contract" alleged because no such contract was statutorily or constitutionally authorized. ■ " 'One dealing with public officers is charged with the knowledge of, and is bound at his peril to ascertain, the extent of their powers to bind the state for which they seem to act. And, if they exceed their authority, the state is

---

[6] The court stated: "There is no merit to defendants' position that the board itself could not promise future wage increases because such authority was not expressly granted by statute. The power to enter into contracts of employment, to fix salaries . . . and to perform all acts necessary to carry out these functions . . . clearly authorizes the board to consummate agreements regarding future wages, in the absence of specific restrictions to the contrary. . . ." (70 Cal.2d at p. 248.)

not bound thereby to any extent.' " (*Hilltop Properties* v. *State of California, supra,* 233 Cal.App.2d at p. 366, quoting from *Mullan* v. *State of California,* 114 Cal. 578, 587 [46 P. 670].)

*Inverse Condemnation*

■ Air Quality contends that after it relied on Board's representations and committed in excess of $2 million to develop the exhaust device, it had a "property right . . . in the form of an interest in selling its Pure Power Systems in accordance with Board's published rules." It further contends: "Since the Board took that right without paying compensation, it is liable in inverse condemnation." Although Air Quality does not further specify the actions by which Board is alleged to have "taken" its property, the only allegations to which the asserted "taking" could have reference was the Board's approval of the GM device, either as to 85 percent of the market or the remaining 15 percent of the market or both, contrary to the statutory requirements and its own regulations.

We entertain great doubt that Air Quality had a property right, as it asserts, consisting of the right to sell its Pure Power Systems in accordance with Board's published rules, for Board was fully authorized to modify its standards and reevaluate earlier decisions as to how best to carry out its statutory mission. But assuming arguendo that Air Quality had such a property right and further assuming that Board's action in approving the GM device, either in the first instance or as to the additional 15 percent, constituted a taking for public use sufficient to support an inverse condemnation action,[7] inverse condemnation is not an available remedy in the circumstances of this case.

[7]The parties' use of hypothetical situations demonstrates that Air Quality misapprehends the doctrine of inverse condemnation. The Attorney General asserted hypothetically that if a pedestrian were hit by a state car and lost an arm, the pedestrian would have no cause of action for inverse condemnation. Air Quality replies; "Of course not. But if the victim were in his home, and his home was damaged by the runaway state car, there would be inverse condemnation liability for damage to the home." Not so. Not every tort committed by governmental entity that results in property damage gives rise to an action in inverse condemnation. Inverse condemnation is appropriate only when private property is taken or damaged in respect to public use or use for the public benefit. (See *Bauer* v. *County of Ventura,* 45 Cal.2d 276, 284-285 [289 P.2d 1]; *Sutfin* v. *State of California,* 261 Cal.App.2d 50, 55 [67 Cal.Rptr. 665]; Van Alstyne, *Statutory Modification of Inverse Condemnation: The Scope of Legislative Power* (1967) 19 Stan. L.Rev. 727, 780-781.)

If, as Air Quality asserts, the authorization for use of the GM device was unlawful because contrary to the statutory standards and regulations of Board, Air Quality's remedy lay in seeking a writ of mandate to compel Board to vacate its authorization for use of the GM device. ■ Compelling public policy relating to fiscal planning and the integrity of the public fisc dictates that a party who claims to be aggrieved by wrongful action of an administrative agency in licensing or otherwise authorizing the use of a particular product or service must be required to seek mandate to compel the agency to set aside its action and thus prevent injury before maintaining a damage action on the theory of inverse condemnation; meaningful governmental fiscal planning would be impossible and legislative control over appropriations emasculated if persons were permitted to simply stand by in the face of administrative action claimed to be unlawful and injurious and years later assert substantial monetary damages on the theory that the administrative action was a taking for public use. (Cf. *Agins* v. *City of Tiburon*, 24 Cal.3d 266, 275-276 [157 Cal.Rptr. 372, 598 P.2d 25]; *Selby Realty Co.* v. *City of San Buenaventura*, 10 Cal.3d 110, 128 [109 Cal.Rptr. 799, 514 P.2d 111]; *Pfeiffer* v. *City of La Mesa*, 69 Cal.App.3d 74, 77-78 [137 Cal.Rptr. 804].) Air Quality took no action to set aside Board's decisions in respect to use of the GM device, and the time for doing so expired long before the present action was instituted.

## *Disposition*

Having determined that the amended complaint does not state facts sufficient to entitle Air Quality to relief, the judgment must be affirmed, and it is unnecessary to discuss whether Board or the state is the proper defendant in the actions or the other questions raised by the parties.

Affirmed.

McDaniel, J., and Morris, J., concurred.

A petition for a rehearing was denied September 19, 1979, and appellant's petition for a hearing by the Supreme Court was denied November 15, 1979. Bird, C. J., was of the opinion that the petition should be granted.