[No. A068765. First Dist., Div. Two. Jan. 4, 1996.]

PIPE TRADES DISTRICT COUNCIL NO. 51 et al., Plaintiffs and Appellants, v.
LLOYD W. AUBRY, JR., as Director, etc., et al., Defendants and Respondents.

## COUNSEL

John J. Davis for Plaintiffs and Appellants.

Sally M. Tedrow and James Carter as Amici Curiae on behalf of Plaintiffs and Appellants.

John M. Rea for Defendants and Respondents.

Lawrence H. Kay as Amicus Curiae on behalf of Defendants and Respondents.

## OPINION

## HAERLE, J.—

### I. INTRODUCTION

In *Independent Roofing Contractors* v. *Department of Industrial Relations* (1994) 23 Cal.App.4th 345 [28 Cal.Rptr.2d 550] (hereafter *Independent Roofing*), we affirmed a decision of the San Francisco Superior Court denying a petition for a writ of mandate sought by two associations of building contractors seeking to compel the state's Department of Industrial Relations (hereafter DIR) to undo an administrative decision depublishing a certain wage determination under California's prevailing wage law (Lab. Code, § 1770 et seq.)[1] The controversy before us in *Independent Roofing* had its genesis in a long-standing jurisdictional dispute between two building and construction trade unions in Northern California, the Laborers and the Pipefitters (hereafter UA), as to which of them has jurisdiction over certain types of construction work. This case involves a subsequent chapter in exactly the same jurisdictional dispute. In it, we affirm the same court's— indeed, the same trial judge's[2]—denial of a similar petition by which the UA sought to compel the DIR to publish, as a part of the same public works/ wage determination process, a since-canceled 1992 "jurisdictional agreement" between the same two unions.

### II. FACTUAL AND PROCEDURAL BACKGROUND

The petitioners below, appellants here, are Pipe Trades District Council No. 51, a regional labor organization, and various local unions affiliated with it, plus three individuals affiliated with those local unions. All of the petitioner unions are affiliated with an international union known as United Association of Journeymen and Apprentices of the Plumbing and Pipefitting industry of the United States and Canada, AFL-CIO.

---

[1] All further statutory references are to the Labor Code.
[2] The Honorable Stuart R. Pollak.

The respondents in this case are the DIR and its Director, Lloyd W. Aubry, Jr. They are charged by law with the administration and enforcement of the Prevailing Wage Law.

The other union which was (and apparently still is) involved in the ongoing jurisdictional dispute with the UA, the Laborers International Union (hereafter Laborers), is not a party to this litigation.

Both in Northern California and elsewhere in the nation jurisdictional disputes have regularly existed between the UA and the Laborers. Focusing on recent times and Northern California, a long-running dispute has existed between these unions as to which one has jurisdiction over the installation of various kinds of piping for various types of water treatment plants. In August of 1979 the Laborers and the UA signed a jurisdictional agreement purportedly settling these disputes and establishing their respective jurisdictions in these areas.[3] However, in July of 1985 the Laborers informed the UA that they were canceling this agreement. This termination was upheld in arbitration, as a consequence of which the jurisdictional dispute resumed. More specifically, the dispute became focused on the construction of water treatment, waste water treatment, and water reclamation plants and pumping stations related to those facilities. The UA's position was that, inasmuch as these projects involved large volumes of pipefitting work which had traditionally been performed by workers affiliated with the UA, its union's workers should be employed at these facilities and at rates established under UA collective bargaining agreements.

Matters apparently reached something of a boiling point in the years 1987 and 1988 when the cities of Benicia and Vacaville awarded contracts for construction of water treatment plants to contractors employing Laborers rather than UA workers. These contractors assigned work which the UA regarded as "pipefitting work" to Laborers whose wage rate was approximately $10 per hour less than the comparable UA wage rate. Respondents refused to take any action against these awards and the resulting wage payments under the Prevailing Wage Law, and the UA found itself unable to settle its specific jurisdictional disputes with the Laborers.

As the UA states, it then decided to "fight fire with fire"; one of its local affiliates created a "craft tender" employee classification to represent "unskilled" construction workers similar to employees affiliated with the Laborers throughout Northern California. The purpose and intent of this tactic was

---

[3]Significantly for present purposes, this agreement was never "published," as a footnote or otherwise, by the DIR under the Prevailing Wage Law. In any event, in approximately 1989 DIR decided, as a policy matter, to discontinue its past practice of including "scope of work footnotes" in its prevailing wage determinations and, instead, decided to leave such matters to the "awarding body" under section 1773.2.

that so-called "craft tenders" would perform most of the same work theretofore done by Laborers, but would do so at wage and fringe benefit rates substantially lower than those in the Laborers Master Agreement with multi-employer bargaining associations. Pursuant to the Prevailing Wage Law, in October of 1989 the UA submitted its first craft tender collective bargaining agreement to respondents for publication. The respondents considered the request, asked for and received further evidence respecting it from the UA and, in May of 1990, published the craft tender wage rate in a general prevailing wage determination.

The UA tactic succeeded: the publication of the craft tender wage rate got the attention of the Laborers, who contended that these "craft tenders" constituted simply a cheaper device for performing unskilled labor within what it regarded as its traditional jurisdiction.

The controversy festered through the remainder of 1990, all of 1991, and into early 1992. Early in that year, the UA and the Laborers began trying again to solve their jurisdictional differences. These efforts led to an April 30, 1992, meeting between two UA representatives and respondent Aubry and some of his subordinates in the DIR. Petitioners maintained in the lower court, and continue to maintain here, that at that meeting they received verbal assurances from Aubry and his colleagues that DIR would publish the text of the jurisdictional agreement between the Laborers and the Pipefitters if such an agreement could be reached[4] and if, additionally, the UA rescinded its craft tender agreement. (As will shortly be developed, DIR's position as to what happened at that meeting was and is quite different.)

In any event, in early May of 1992 negotiators for the two unions met several times in an attempt to finalize an agreement. During the course of one of these meetings, the negotiators telephoned Jean Westgard, the Chief of DIR's Division of Labor Statistics and Research (now deceased) and discussed various questions with her. Westgard requested a copy of the craft tender rescission agreement as soon as possible. The UA representative at the meeting again raised the subject of the publication of the perspective jurisdictional agreement as a footnote to respondents' prevailing wage determination. According to him, Westgard "acknowledged that publication had been agreed upon" at the April 30, 1992, meeting. Westgard was, according to the UA declarant, so "eager" to have the craft tender rescission agreement that she asked that it be sent to her by both fax and mail. The

---

[4]As of April 30, 1992, there was in fact no jurisdictional agreement between the UA and the Laborers with respect to this work. There had been discussions between the two unions and various language had circulated back and forth; however, no written agreement was ever finalized between the two unions until early the following month.

Laborers' representative at the meeting had the jurisdictional agreement typed on Laborers' letterhead and representatives of both unions signed it. On May 11, 1992, both it and the craft tender termination were sent to Westgard as requested.

At the DIR end, however, Director Aubry obviously perceived a major misunderstanding. By a letter dated two days later, on May 13, 1992, he advised both unions that his department objected to the title of the jurisdictional agreement ("Definition of Plumbing and Steamfitting Work Recognized by the Department of Industrial Relations") because the DIR "has *not* recognized this agreement and never agreed to do so as part of the recission of the Craft Tender classification." Aubry reinforced the last point by noting that, in his view, any jurisdictional agreement and the craft tender recission document were "separate" and "address two different issues."

Aubry then addressed the April 30 discussions in his office regarding the jurisdictional agreement, stating: "With regard to the proposed language to resolve the dispute between the Laborers and the Pipe Trades, I encouraged the Pipe Trades to attempt to resolve this problem. I indicated that if an agreement could be reached, the Department would *consider* publishing it as a footnote in the prevailing wage determination. However, I also indicated that before that could happen the employers who are signatories to the collective bargaining agreements supporting the Laborers' and Pipe Trades' prevailing wage determinations would have to be consulted. Finally, I also suggested that if an agreement could be reached, I would want to address the issue, probably through a subcommittee, under the auspices of the Public Works Advisory Committee."

On May 22, 1992, the DIR issued a notice announcing that the craft tender collecting bargaining agreement had been rescinded and that the craft tender classification would no longer be recognized on public works jobs.[5] This notice made no reference to any jurisdictional agreement between the two unions.

Subsequent to Aubry's May 13 letter, UA representatives kept pressing DIR for publication of a jurisdictional agreement. DIR's only response was to set up a "Prevailing Wage Advisory Committee" (PWAC) to study the issue. Included as members of this committee were a representative of the Association of General Contractors of Northern California (AGC), a multi-employer bargaining association whose members are signatories to collective bargaining agreements with the Laborers but not with the UA.

---

[5]It was this action which triggered the litigation which eventually came to us in the form of the *Independent Roofing* case. (*Independent Roofing, supra,* 23 Cal.App.4th 345.)

In July of 1992 Westgard wrote to the chief UA negotiator in the matter advising that the PWAC had raised various concerns with respect to the UA's request of a "footnote, notice or other mechanism" with respect to the suggested jurisdictional agreement. Among those concerns was "whether a change in awarding body in DIR enforcement policy can be supported by an intra-union agreement, or whether a collective bargaining agreement executed by employers or some other mechanism is necessary." In the same month, and as a result of some of the expressed concerns of Aubry and Westgard, the two unions amended the agreement and resubmitted a second version to DIR.

On August 22, 1992, another meeting of the PWAC took place at which various committee members expressed additional concerns about the jurisdictional agreement. In early September of 1992, its text was once again amended by the two union parties and yet another (the third) version of the agreement was submitted to DIR. It is this version that is the focus of this litigation.

During late 1992 and early 1993 Aubry asked for letter briefs addressing various legal issues raised by the opponents to the publication of the jurisdictional agreement; such were ultimately submitted. Respondents did not, however, ever publish the jurisdictional agreement. Eventually, on June 16, 1994, the UA filed its petition in the court below. One day later, the Laborers wrote to the UA terminating the September 1992 jurisdictional agreement. At oral argument, UA's counsel conceded that no litigation or arbitration has been initiated to contest that purported termination.

The petition alleged two causes of action; the first asserted that respondents were obliged to publish the 1992 jurisdictional agreement as a part of their statutory duties under sections 1770 and 1773. The second was based on an alleged "express agreement" under which, effectively in consideration of the rescission by the UA of the craft tender agreement, the respondents would publish the contemporaneous jurisdictional agreement.

The trial court first disposed of the "express agreement" cause of action. By a September 23, 1994, "Order Granting Summary Adjudication," it found that this cause of action raised no triable issue of material fact for two reasons: (1) the cause of action was barred by the two-year statute of limitations applicable to oral agreements (Code Civ. Proc., § 339) "in that the May 13, 1992, letter from Respondent Lloyd W. Aubry, Jr., constitutes a clear repudiation of the alleged oral agreement"; and (2) any such alleged oral agreement would be unenforceable to the extent it purported to create "any obligation beyond those imposed by statute."

A few months later, after the submission of further pleadings and further argument, the trial court denied the petition. It ruled, relying substantially on our decision in *Independent Roofing, supra*, 23 Cal.App.4th 345, that the pertinent statutory provisions did not require the respondents to publish jurisdictional agreements of this sort, and that to sustain the UA's position "in effect calls for a significant expansion of the role of the Department of Industrial Relations and, as such, must be addressed to the Legislature rather than to the courts."

Appellants timely filed this appeal on January 18, 1995.

## III. DISCUSSION

### A. *The Prevailing Wage Law*

Before proceeding to resolve this controversy, some introduction is necessary as to the background, purpose and effect of California's prevailing wage law. However, this court has recently provided exactly that in *Independent Roofing* and we can do no better than to quote what we said then and there on this subject: "To effect public policy in favor of enforcing minimum labor standards, the conditions of employment on publicly financed construction projects are governed by California's prevailing wage law. (Lab. Code, §§ 90.5, 1720-1861; see *Lusardi Construction Co.* v. *Aubry* (1992) 1 Cal.4th 976, 986 [4 Cal.Rptr.2d 837, 824 P.2d 643].) With certain exceptions, all workers employed on public works shall be paid the general prevailing rate of per diem wages in the locality in which the public work is performed, as determined by the Director of the Department. (§ 1771.) A public entity awarding a contract for public works must obtain prevailing wage data from the Director, and must 'specify those rates in its call for bids, in bid specifications, and in the contract, or alternatively, must specify in those documents that the prevailing wage rates are on file in its principal office.' (*Lusardi Construction Co.* v. *Aubry, supra*, 1 Cal.4th at p. 986; §§ 1773, 1773.2.) The Director's determination of the prevailing wage is to be based on consideration of wage rates set by collective bargaining agreements and for federal public works in the same area, unless those rates do not 'constitute the rates actually prevailing in the locality,' in which case the Director is to 'obtain and consider' other data from labor organizations, employers, and employer associations. (§ 1773.) If any bidder, employee representative, or awarding body desires to challenge a rate set by the Director, it may file a petition to review the determination with the Director within 20 days after the 'commencement of advertising of the call for bids by the awarding body.' (§ 1773.4.) Upon receiving such a petition, the Director must notify interested parties and conduct an investigation.

(§ 1773.4.) Within 20 days of the filing of the petition, or after such time as may be agreed on by the awarding body, the Director, and all interested parties, the Director shall make a new determination which is final and binding on the awarding body. (§ 1773.4.) [¶] . . . The actual authority of the Department is to make two determinations; first, whether a particular type of worker or work is covered by the prevailing wage laws, and second, if so, what the prevailing wage for that category of work should be (§§ 1772, 1773; see *Winzler & Kelly* v. *Department of Industrial Relations* (1981) 121 Cal.App.3d 120, 127 [174 Cal.Rptr. 744] [review of Department's determination that surveyors were covered by prevailing wage law].)" (*Independent Roofing, supra,* 23 Cal.App.4th at pp. 351-352, fns. omitted.)

B. *Standard of Review*

An order denying a petition for writ of mandate is appealable. (*Independent Roofing, supra,* 23 Cal.App.4th at p. 352; *Elmore* v. *Imperial Irrigation Dist.* (1984) 159 Cal.App.3d 185, 190-191 [205 Cal.Rptr. 433].) ██ Inasmuch as the statute in question grants the department "legislative discretion" (*Independent Roofing, supra,* 23 Cal.App.4th at p. 354), we review respondents' failure to publish the jurisdictional agreement under what is effectively an abuse of discretion standard, i.e., an agency's nonadjudicatory action will not be set aside unless it is inconsistent with the statute, arbitrary, capricious, unlawful or contrary to public policy. (See Eisenberg et al., Cal. Practice Guide: Civil Appeals & Writs (The Rutter Group 1995) ¶¶ 8:128.5 to 8:128.6, p. 8-47 and cases cited therein.) However, we will apply the independent review standard to our review of the trial court's grant of partial summary adjudication. (Eisenberg et al., Cal Practice Guide: Civil Appeals & Writs, *supra,* at ¶ 8:167 et seq.)

C. *Petitioners' First Cause of Action*

Petitioners' basic position in support of their appeal from the trial court's denial of their first cause of action is that two sections of the Labor Code, considered together, mandate that the DIR publish the September 1992 jurisdictional agreement.

The first provision petitioners rely upon, section 1770, provides in pertinent part as follows: "The Director of the Department of Industrial Relations shall determine the general prevailing rate of per diem wages in accordance with the standards set forth in Section 1773, and the director's determination in the matter shall be final except as provided in Section 1773.4."

The responsibility thus invested in DIR is defined by the second provision relied upon, section 1773, as follows: "In determining such rates, the Director of the Department of Industrial Relations shall ascertain and consider the

applicable wage rates established by collective bargaining agreements and such rates as may have been predetermined for federal public works, within the locality and in the nearest labor market area. Where such rates do not constitute the rates actually prevailing in the locality, the director shall obtain and consider further data from the labor organizations and employers or employer associations concerned, including the recognized collective bargaining representatives for the particular craft, classification or type of work involved. The rate fixed for each craft, classification or type of work shall be not less than the prevailing rate paid in such craft, classification of type of work. [¶] If the director determines that the rate of prevailing wage for any craft, classification or type of workman is the rate established by a collective bargaining agreement, the director may adopt such rate by reference as provided for in such agreement and such determination shall be effective for the life of such agreement or until the director determines that another rate should be adopted."

For three separate and distinct of reasons, we disagree with petitioners and agree with the trial court as to what these provisions do and do not require DIR to do. Our reasons are as follows:

1. *Both by the express terms of the statute and otherwise, the DIR has substantial discretion in this area.*

 It is, we submit, noteworthy that the language used in the statutory provision upon which petitioners most heavily rely (§ 1773) is quite clearly language of discretion, not direction. The first paragraph quoted above from section 1773 explicitly says that in determining the "general prevailing rate," the DIR shall "ascertain *and consider*" rates as established by collective bargaining agreements and on federal public works projects. If that is not sufficient, the section continues, the DIR shall then "obtain *and consider*" other data. (Italics added.) The section then goes on to say that, if the DIR determines that a collective bargaining agreement in fact establishes a prevailing rate, it "*may* adopt such rate by reference" to that agreement. (Italics added.)

We think it is clear from the language used in the statute that the DIR has substantial discretion as to what agreements or other sources it references in the process of determining "prevailing wages." Indeed, in *Independent Roofing* we said substantially that. There, the petitioning employer associations argued that, as applied in the circumstances there involved, there had been an unconstitutional delegation of legislative power to private parties because the DIR could—and, the petitioners argued, did—uncritically rely on what the collective bargaining parties provided in their agreements. Not so, we said. We noted, first of all, that the DIR's authority regarding prevailing

wage determinations is "quasi-legislative" and thus that it has "legislative discretion" in such decisions (*Independent Roofing, supra,* 23 Cal.App.4th at p. 354). We next quoted, as we did just above, the significant statutory language involved, including the word "consider." (*Id.* at p. 355.) We then stated: "The scheme does not contemplate that the Department will necessarily adopt terms agreed to by private parties; rather it authorizes the Department to rely on the terms worked out by private parties only when it reasonably determines that their agreement accurately reflects market forces at work in the geographical area in question." (*Id.* at pp. 355-356.)

Next, we noted that, although there might indeed be a constitutional problem involved if the DIR could simply and uncritically adapt a wage rate found in a collective bargaining agreement, that is not what is supposed to happen under the statutory scheme. We noted that the record before us there did not support any argument that the DIR made a "reflexive response" to the agreements of private parties and that the statutory scheme mandated a "critical review" of relevant collective bargaining agreements. (*Independent Roofing, supra,* 23 Cal.App.4th at p. 357.) In short, *Independent Roofing* clearly stands, among other things of course, for the proposition that section 1773 grants substantial discretion to the DIR.

And *Independent Roofing* was not the first time we reached such a conclusion regarding the DIR's powers under the Labor Code. In *Painting & Drywall Work Preservation Fund, Inc.* v. *Aubry* (1988) 206 Cal.App.3d 682, 687 [253 Cal.Rptr. 776], we reversed an order of this same trial court granting a petition for a writ of mandate which purported to require the Labor Commissioner to investigate nine specific complaints filed with that office alleging violations of the same prevailing wage statute as is involved here. After quoting from the pertinent statutes, we held: "Consequently, the Labor Commissioner has discretion to determine which investigations to conduct. The statute creates no duty, express or implied, which requires Division to investigate or take action on every complaint which is filed with the Division. [¶] Moreover, mandamus cannot be applied to control discretion as to a matter lawfully entrusted to a governmental agency. (*State of California* v. *Superior Court* (1974) 12 Cal.3d 237, 247 [115 Cal.Rptr. 497, 524 P.2d 1281].)"

■ Our Supreme Court has stated the general rule applicable in this area to be: "It is elementary that mandamus issues only 'to compel the performance of an act which the law specially enjoins' [citation] and will not lie to control discretion within the area lawfully entrusted to the administrative agency [citation]." (*Faulkner* v. *Cal. Toll Bridge Authority* (1953) 40 Cal.2d 317, 326 [253 P.2d 659]; see generally, 8 Witkin, Cal. Procedure (3d ed.

1985) Extraordinary Writs, § 80, pp. 720-721.) This court has recently echoed this rule. In *Bayside Auto & Truck Sales, Inc.* v. *Department of Transportation* (1993) 21 Cal.App.4th 561, 570 [26 Cal.Rptr.2d 109], we considered an appeal from the trial court's denial of a petition for a writ of mandate to compel the California Department of Transportation to offer to sell petitioner a certain parcel of San Francisco real estate owned by the Department and leased to the petitioner for the prior 18 years. Petitioner claimed that the parcel should have been offered to it as "excess property." In denying the appeal, we stated: "Mandate may lie to *compel* an exercise of discretion but not to *control* it, i.e. to order its exercise in a particular manner [citation], unless discretion can be lawfully exercised only one way under the facts [citation]." (Italics in original.)

As our colleagues in Division Four have emphasized, this rule is subject to even more rigorous adherence when what is involved is, as here, legislative discretion, i.e., where the administrative agency involved is engaged in a rule-making function. In *Sklar* v. *Franchise Tax Board* (1986) 185 Cal.App.3d 616 [230 Cal.Rptr. 42], that court considered an appeal from the trial court's denial of a petition for a writ of mandate to compel the Franchise Tax Board to adopt regulations limiting the deductibility for California income tax purposes of entertainment expenses related to the consumption of alcohol. The court noted that any "actions by the Board concerning the formulation and promulgation of regulations are taken by it in its legislative capacity." (*Id.* at p. 624.) Although, it continued, that did not mean the act was immunized from mandamus, "judicial power relative to legislative acts is severely circumscribed." (*Ibid.*) It explained: "It is true, as plaintiffs contend, that 'mandamus will lie to correct an abuse . . . occurring by virtue of a failure to exercise discretion.' [Citation.] An examination of this contention establishes that it is a recasting of plaintiffs' claim that the Board has a ministerial duty to exercise its rule-making function. As has been shown, however, the Board's inaction implicates a sensitive area of legislative discretion. In light of the circumstances detailed in the preceding discussion, plaintiffs have not demonstrated that the Board's inaction in not prescribing regulations embodying the precise substance and content plaintiffs desire amounts to abuse." (*Id.* at pp. 625-626.)

And Division Three of this court stated the rule applicable in cases in which review is sought of "quasi-legislative" actions as follows: "Where judicial review of administrative action by an agency acting in its legislative capacity is sought, that review begins and ends with a determination as to whether the agency's action has been ' " ' arbitrary, capricious, or entirely lacking in evidentiary support, or whether [it] has failed to follow the procedure and give the notices required by law.' " ' [Citations.]" (*Davies* v.

*Contractors' State License Bd.* (1978) 79 Cal.App.3d 940, 946 [145 Cal.Rptr. 284].)

 Finally in this connection, it should be noted that, if the DIR was required to adopt the rates established in any particular agreement, it might well violate the constitutional prohibition against delegating administrative rule-making authority to private parties. This was precisely the point we had in mind in *Independent Roofing*; the relevant principle is espoused in many other cases, as well. (See, e.g., *State Bd. of Education* v. *Honig* (1993) 13 Cal.App.4th 720, 750 [16 Cal.Rptr.2d 727]; *Bayside Timber Co.* v. *Board of Supervisors* (1971) 20 Cal.App.3d 1, 11 [97 Cal.Rptr. 431].)

The law is thus clear that DIR had substantial discretion as to whether to publish the disputed jurisdictional agreement. And the record is clear that it went to considerable pains to discuss the issue, not once but several times, with the two interested unions. Its concerns were laid out in a detailed letter to the UA by one of its top officials, and it even went to the length of convening an advisory committee of union and employer representatives to consider the issues raised by the UA's several requests for publication. And, finally, it asked for briefs from the interested parties regarding the concerns raised by potentially adversely affected parties at the several meetings of this advisory committee. Although we think it clearly would have been better form if the DIR had, after the receipt and consideration of these briefs, finally and dispositively stated "on the record" that it was not going to publish the agreement, together with the reasons why not, clearly the DIR's conduct throughout this controversy has been the opposite of "arbitrary and capricious." As a consequence, we will not second guess its action in not publishing the jurisdictional agreement.[6]

---

[6]This conclusion particularly obtains where, as here, there is a considerable question as to whether the agreement is still viable. As noted above, one day after the subject petition was filed, the Laborers canceled the September 1992 agreement. No action contesting this cancellation has been taken by the UA. We note, additionally, that an apparently similar cancellation by the Laborers in 1985 was unheld in arbitration. Even assuming DIR might have had some obligation to publish a viable agreement of this sort, it is difficult to understand why it now has a duty to publish a very possibly canceled one.

At oral argument, we asked the parties to comment on whether, because of the Laborers' purported cancellation, this appeal was mooted. UA's counsel responded that (a) mootness was an issue determined adversely to the DIR on both causes of action by Judge Pollak and (b) in any event, the issue had not been briefed in this case. The former contention appears to be correct but the latter is not: the UA devoted three pages of its opening brief to the issue of why the Laborers were "estopped" to cancel the agreement. In any event, our comment above is not intended as a holding that the appeal is formally mooted by the purported cancellation but only that, in reviewing the exercise of the DIR's quasi-legislative powers in this arena, we can and will take into consideration what the party protesting the exercise of those powers realistically appears to have at issue.

*2. The "jurisdictional agreement" at issue was not entitled to treatment as a collective bargaining agreement for purposes of section 1773.*

■ Section 1773 references "collective bargaining agreements" as one of the principal sources of data for "consideration" by the DIR. Petitioners argue strongly that the subject agreement can and should be included in that category for present purposes. We disagree.

First of all, DIR has adopted regulations which define with considerable specificity what must be shown either in or in conjunction with a bona fide collective bargaining agreement. Section 16200, subdivision (a)(1)(C) of the California Code of Regulations provides: "Collective bargaining agreements filed with the Division of Labor Statistics and Research must be accompanied by a signed statement which is certified as true and correct to the best of the knowledge and belief of the person preparing the statement, under penalty of perjury, and which: [¶] 1. certifies that the agreement filed is fully executed and in effect, unless it is a signed original agreement or photocopy thereof, or a printed copy of a fully executed agreement showing the names of the signatory parties, except in the case of a printed agreement the Director may require certification; [¶] 2. names or otherwise identifies all California counties within the jurisdiction of the local union or unions signatory to the agreement; [¶] 3. names and provides the address of the signatory employer association or, if there be no signatory employer association, provides the names and addresses of all contractors signatory to the agreement, unless such information is contained in the agreement; [¶] 4. provides the number of workers currently employed under the terms of the agreement and, if practicable, the number of workers in each county within the jurisdiction of the signatory local union or unions." (Cal. Code Regs. tit. 8, § 16200, subd. (a)(1)(C).)

It is clear that the agreement in question leaves a lot be desired when measured (as Chief Westgard measured it in 1992) against the foregoing requirements; in particular, but by no means exclusively, we note the complete absence of any employer or employer association signatures or even a list of supposedly bound employers.[7]

Precisely that omission was central to the holding of the United States Court of Appeals for the Ninth Circuit in *IAM. Dist. Lodge No. 94* v. *ILWU Local 13* (9th Cir. 1986) 781 F.2d 685, 689 (hereafter *IAM*). There, the

---

[7]We cited an immediately adjacent regulation to the quoted one in *Independent Roofing*, *supra*, 23 Cal.App.4th at page 355, and noted that it forbade DIR "from relying on the agreement without taking into consideration" whether the agreement contained the information required by these regulations.

plaintiff union sued another union under a provision (§ 301) of the 1947 federal Labor Management Relations Act authorizing federal court actions to enforce collective bargaining agreements. However, the agreement at issue there, like the one in the present case, was, only between two unions relative to their jurisdictional dispute. Reversing a lower court grant of an injunction enforcing the agreement, the Court of Appeals stressed the combination of facts that (a) there were no employers signatory to the agreement, although (b) employers were indeed signatory to other bona fide collective bargaining agreements, while (c) those employers would be very much impacted by enforcement of the injunction. While agreeing that, under some circumstances, inter-union jurisdictional agreements may be enforced under section 301 of the Labor Management Relations Act, the court held that, where non-signatory employers would be adversely impacted by enforcement of a jurisdictional agreement, it should not be enforced against them. It held: "We reject IAM's contention that only IAM and LOCAL 13 are impacted by the injunction. It simply is not accurate. Even if the injunction can be read to apply only to IAM and LOCAL 13, the PMA member-employers are still deprived of the workers they have independently agreed to hire, because LOCAL 13 members would be enjoined from accepting the jobs. This amounts to a clear impact. [¶] . . . In our opinion, national labor policy dictates that local jurisdictional contracts, such as the 1973 agreement here, are secondary to bonafide, industry-wide collective bargaining agreements, and when in conflict the jurisdictional contract must give way. . . . [¶] To permit individual members or segments of the bargaining unit to unilaterally alter the agreements reached through the bargaining process would result in serious consequences to the labor relations framework." (781 F.2d at p. 690.)

Just so here: enforcement of the subject jurisdictional agreement would adversely impact on AGC-affiliated employers who employ Laborers—at, of course, Laborers's rates—to do work claimed by the UA. On exactly the same process of reasoning as the Ninth Circuit in *IAM*, *supra*, 781 F.2d 685, we are of the view that the combination of the negative impact the jurisdictional agreement would have on other legitimate labor-management relationships and the utter absence of any apparent employer subscription to it compels the conclusion that it is not entitled to treatment as a bona fide collective bargaining agreement for purposes of section 1773.[8]

One final point with respect to this issue: we note again that a similar jurisdictional agreement between these same two union groups was in effect from 1979 through 1985, but never referenced officially in any way by DIR.

---

[8]As we said in *Independent Roofing*, "nothing in the statutory scheme prevents [DIR] from determining that the information provided to it is insufficient to support a wage determination . . . ." (*Independent Roofing*, *supra*, 23 Cal.App.4th at p. 359.)

The UA has not explained why DIR must footnote or publish the 1992 agreement when it did no such thing respecting the similar 1979-1985 agreement.

3. *The jurisdictional agreement involves matters with which the DIR is not required to involve itself.*

It bears repeating that section 1773 speaks of the task of gathering and then publishing information relative to the "general prevailing rate of . . . wages . . . for each craft, classification or type of workman needed . . . ." The September 1992 agreement involves matters far beyond, and perhaps even significantly different from, this topic. What it dealt with, indeed the only thing it dealt with, is which union's rates are to be paid with respect to specific tasks on a narrow range of construction projects.

To take the most obvious point first, by its terms the agreement relates only to "water treatment plants, wastewater . . . treatment plants, water reclamation plants, and all pumping facilities related to such plants . . . ." It covers no other work, and hence is a jurisdictional agreement of extremely limited scope.

It also gets into matters far narrower than issues of "craft, classification or type of workman," e.g., the types of *detailed, narrow* tasks the various workers are to perform. Thus, apparently, if a workman is involved in the installation of "soil, waste . . . [or] drain . . . piping" he is to be paid under the UA agreement but if he is installing "non-pressurized surface and storm drain piping"[9] he is to be paid pursuant to the Laborers' agreement. We suggest this sort of delicate line-drawing goes far beyond the task of determining "general prevailing wages" by "craft, classification or type of workman." Indeed, our language in *Independent Roofing* summarized the law's provisions in this regard by saying that it involved determining "what the prevailing wage for that category of worker should be." (*Independent Roofing, supra,* 23 Cal.App.4th at p. 352.) Neither that case nor any other of which we are aware says—or even hints—that the DIR must or even may get into such exquisite distinctions of the sort noted above.

In this connection, we observe that other provisions of the Labor Code give the pertinent awarding bodies substantial authority to implement the determinations of the DIR regarding "general prevailing wages." Thus, the awarding body and not the DIR is responsible for specifying in its call for bids what "category of worker" it requires. (See *Independent Roofing, supra,* 23 Cal.App.4th at p. 352; see also §§ 1726, 1727, 1771.5, 1773.2, 1773.8 et

---

[9]We confess we do not remotely understand the difference.

seq.) Finally, and to the extent the statutory terms do not specify what the awarding bodies must and may do, section 1773.5 allows the DIR to establish rules and regulations for the purposes of carrying out the law, including specifically the "responsibilities of awarding bodies" under it. Collectively, these provisions of the prevailing wage law suggest rather strongly that once the limited determination is made by the DIR under section 1773, its authority gives way to that of the awarding body.

### D. *Petitioners' Second Cause of Action*

As discussed above, petitioners' second cause of action asked that the writ be issued "to compel respondents' performance of their obligations under the agreement" the UA alleges DIR made to publish the jurisdictional agreement. The theory of this cause of action is that the DIR is equitably estopped to refuse publication of the jurisdictional agreement. It is based on the premise that, on April 30, 1992, DIR's representatives affirmatively agreed to publish, by "footnote" or otherwise, a jurisdictional agreement between the UA and the Laborers if the two unions could also agree (as they did) regarding a rescission of the craft tender agreement.[10]

As also noted above, the trial court disposed of this cause of action early on. It held, granting DIR's motion for summary adjudication, that any such "alleged oral agreement" was (a) repudiated by Director Aubry's May 13, 1992, letter to the parties and (b) would be unenforceable to the extent that it arguably created an obligation going beyond the statute. We agree, and further suggest that, in view of the record before us, the petitioners' appeal of the dismissal of their second cause of action borders on the frivolous.

In the first place, and although the trial court did not say so in so many words, it is perfectly obvious that, as much as the UA would like to have us believe that the parties had a meeting of the minds at the April 30, 1992, meeting, no such thing occurred. The principal "evidence" of such an agreement by DIR derives from one paragraph of one 1994 declaration of one UA participant[11] in that meeting, a declaration prepared by UA counsel for purposes of this litigation. By contrast, the record contains not one but two contemporaneous letters from DIR officials making quite clear that they were "keeping their powder dry" on this issue. Director Aubry's May 13 letter, explicitly relied on by the trial court and quoted above, makes very clear that all he had committed to on April 30 was to "consider" footnoting

---

[10]This agreement, it is alleged, was "acknowledged" or "confirmed" in several subsequent telephone conversations between UA negotiators and Aubry's deputy, Westgard. As to these allegations, see footnote 13, *post*.

[11]There is, instructively, no similar declaration from any other participant in that meeting, including the other UA representative present.

such an agreement—no more and no less than his statutory obligation. The letter flatly states that DIR "never agreed [to recognize this agreement] as part of the recission of the Craft Tender classification."

Even after much subsequent communication between Aubry's deputy, Westgard, and the UA, on July 3, 1992, the former wrote yet another letter to the UA spelling out, in considerable detail, her problems with footnoting the agreement as it was then before her (the first, or May 11, version). It is unnecessary to reiterate all of these concerns, [12] except to say that the text of the letter makes it abundantly clear that Westgard was obviously not then operating under the impression that she and her boss had any sort of an "agreement" with the UA to recognize a jurisdictional agreement between the two unions.[13]

As we have already noted, the trial court held that Aubry's May 13, 1992, letter constituted a "repudiation" of any "alleged oral agreement," a repudiation which started the two year statute of limitations of Code of Civil Procedure section 339 running.[14] We agree, but we also conclude that the record makes abundantly clear that there simply was no such agreement.

[12]One was precisely the issue we dealt with in part C, 2, *ante*: the absence of any employer involvement in the agreement. Westgard said: "The meeting ended with three concerns. The first is whether a change in awarding body and DIR enforcement policy can be supported by an intra-union agreement, or whether a collective bargaining agreement executed by employers or some other mechanism is necessary."

[13]In light of this letter and Aubry's definitive May 13, 1992, letter, we can well understand why the trial court did not pay much attention to the two 1994 declarations alleging two telephonic "acknowledgments" and "confirmations" by the since deceased Westgard of the April 30, 1992, "agreement." In this connection, one paragraph of one of the 1994 UA declarations makes manifest that Westgard's actions were inconsistent with the existence of any firm agreement: "I contacted D.I.R. [in the period May-July 1992] in an attempt to obtain compliance with its agreement to publish the jurisdictional agreement in its prevailing wage determinations. D.L.S.R. Chief Jean Westgard responded that D.I.R. wanted to set up an advisory committee, to be called the Prevailing Wage Advisory Committee ('P.W.A.C.'), to study the issue."

[14]Petitioners argue that, even assuming the two-year statute was applicable, Westgard "reconfirmed" the agreement in a July 1992 telephone conversation and, by so doing, tolled the running of the statute. The argument is specious: the "agreement," if any, was as of April 30, 1992, and its existence was clearly repudiated *in writing* explicitly by Aubry in May of 1992 and implicitly by Westgard two months later. We agree with the implicit determination of the trial court that an allegation, made two years later and after the death of the other party, of a "reconfirming" telephone call so at variance with the contemporaneous written record is entitled to little if any weight.

Petitioners alternatively argue that the period of limitations is three years under Code of Civil Procedure section 339 because it is one "created by statute." They are clearly wrong; to fall within that provision the obligation must be *entirely* created by statute, i.e., be one as to which "no element of agreement enters." (See *Gardner* v. *Basich Bros. Construction Co.* (1955) 44 Cal.2d 191, 194 [281 P.2d 521].)

The alternative ground of the trial court's holding, i.e., that any such oral agreement would be unenforceable to the extent it purported to impose on DIR any obligation above and beyond that imposed by section 1773 is also clearly correct. Petitioners argue that this rule only applies when the obligation sought to be imposed by the purported contract is "contrary" to statute, and that principle doesn't apply here because they were merely seeking action by the DIR consistent with their purported contract. ■ They misread the applicable cases, which stand for the much broader proposition that a governmental agency is not estopped to contest the validity of an agreement by which the agency commits to take action which is either unauthorized or inhibits its authority to take action which is authorized. (See, e.g., *Air Quality Products, Inc.* v. *State of California* (1979) 96 Cal.App.3d 340, 349-351 [157 Cal.Rptr. 791]; *Delucchi* v. *County of Santa Cruz* (1986) 179 Cal.App.3d 814, 823 [225 Cal.Rptr. 43].)

## IV. CONCLUSION

The orders denying the petition for a writ of mandate are affirmed.[15]

Smith, Acting P. J., and Phelan, J., concurred.

---

[15]In a postbriefing motion, the UA asked that portions of the respondents' brief be stricken inasmuch as they allegedly asserted facts unsupported by the record. Several of the five challenged assertions are, indeed, supported by the record and others are more argument than assertions. In any event, we have not relied on any "unsupported assertions" and, accordingly, the motion is denied.