101 Cal.Rptr.2d 909 (2000)
85 Cal.App.4th 334
Andy L. HESTAND et al., Plaintiffs and Appellants,
v.
Marcy SAUNDERS, as Labor Commissioner, etc., et al., Defendants and Respondents.
No. G024918.
Court of Appeal, Fourth District, Division Three.
December 8, 2000.
As Modified on Denial of Rehearing January 8, 2001.
Review Denied February 21, 2001.[*]
*910 Law Offices of Carroll & Scully, Inc., Donald C. Carroll and Charles P. Scully, II, San Francisco, for Plaintiffs and Appellants.
Miles E. Locker, Chief Counsel, Division of Labor Standards Enforcement, for Defendants and Respondents Marcy Saunders, as Labor Commissioner, and Division of Labor Standards Enforcement.
Morrow, Golenor & Salisbury, Laura J. Bintliff and Richard J. Golenor, Westlake Village, for Defendant and Respondent Odebrecht Contractors of California, Inc.
Littler Mendelson, Daniel K. Klingenberger, Fresno, and Jason H. Borchers, for Association of Energy Service Companies, California Chapter as Amicus Curiae on behalf of Defendant and Respondent Odebrecht Contractors of California, Inc.
Archbald & Spray and Douglas B. Large, Santa Barbara, for Veco Drilling, Inc. as Amicus Curiae.

OPINION
BEDSWORTH, J.
Andy L. Hestand, Rick A. Bishop and Fred M. Matthiesen (collectively "Hestand" except where clarity dictates they be considered individually) appeal from a judgment denying their petition for a peremptory writ of mandate. They sought to compel Marcy Saunders, as Labor Commissioner of California,[1] and the Division of Labor Standards Enforcement (DLSE) which she heads, to process this complaint for overtime pay allegedly due under Wage Order 4-89. Hestand argues mandamus *911 is the proper procedure to review an agency's interpretation of its regulations, he is covered by the wage order, and the trial court improperly considered parol evidence that it was not intended to apply to the "on-site construction" industry in which he works.
We agree that mandate lies, but conclude that Wage Order 4-89 was never intended to apply to the on-site construction industry. Accordingly, we affirm the judgment denying the writ.

* * *
Hestand and his colleagues were employed by Odebrecht Contractors of California, Inc. (Odebrecht), the general contractor engaged to construct the Seven Oaks Dam in San Bernardino County. Hestand and Bishop were mechanics; Matthiesen was a heavy equipment operator. In 1997, each filed a claim with the DLSE for unpaid overtime, alleging that he regularly worked more than 8 hours per day but only was paid overtime for work in excess of a 40-hour week. The DLSE refused to act upon the complaints, in accord with its position that the on-site construction industry was not covered by Wage Order 4-89, instead being regulated by federal law which mandates overtime pay for work beyond a 40-hour week. This writ petition followed.
The DLSE, headed by the Labor Commissioner, is the state agency charged with enforcing California's labor laws. (Lab. Code §§ 21, 61, 95, 98-98.7, 1193.5.)[2] These include the regulations of the Industrial Welfare Commission (IWC), the agency empowered to adopt regulations governing employment within the state. (§§ 1173, 1178.5, 1182.) Such regulations are known as wage orders.
Wage Order 4-89 applies "to all persons employed in professional, technical, clerical, mechanical, and similar occupations ... unless such occupation is performed in an industry covered by an industry order of this Commission...." (Cal.Code Regs., tit. 8, § 11040, subd. 1, italics added.)[3] This general statement of coverage is amplified by a long list of included occupations, among which are "mechanics," "vehicle operators," and the general catch-all "other related occupations listed as professional, semiprofessional, technical, clerical, mechanical and kindred occupations." (Cal.Code Regs., tit. 8, § 11040, subd. 2(C).) Wage Order 4-89 bars work in excess of eight hours in any twenty-four hour period, or more than forty hours in any workweek, unless the employer pays overtime at rates set out in the order. (Cal.Code Regs., tit.8, § 11040, subd. 3(A).) This is the basis of Hestand's claim, but the history of the IWC and Wage Order 4-89 refutes it.
The IWC was originally established in 1913 to regulate the wages, hours and conditions of employment of women and children. Over the years, it promulgated a series of orders to carry out this mandate. In the early 1970's, several federal decisions invalidated a number of the IWC's orders on the ground that they discriminated on the basis of sex, in violation of the federal Civil Rights Act of 1964. In response, in 1972 and 1973, the Legislature expanded the jurisdiction of the IWC to cover all California workers. (Industrial Welfare Com. v. Superior Court (1980) 27 Cal.3d 690, 700-701, 166 Cal.Rptr. 331, 613 P.2d 579.)
As the IWC worked to amend its orders to comply with its new mandate, it held a public hearing in March 1974. At that forum, the chairman read into the record a statement that the IWC did not intend to cover on-site construction workers in new orders being formulated. The *912 statement explained that historically the IWC did not regulate the drilling, logging, mining or construction industries because very few women or minors were employed in such activities. Alluding to the statutory prerequisites for adopting wage orders, it stated that no investigation was made of working conditions in these industries, and no wage board was appointed to consider them.[4] "In short, as drilling, mining, logging and on-site construction activities have never been covered and the wage board process has not been invoked with respect to them, such activities are not regulated in the proposed orders."[5]
Despite this stated intent, the IWC did not amend the then-existing version of Order 4, Order 4-68, to reflect such an exclusion. In fact, although Order 4 was revised in 1976 (Order 4-76), 1980 (Order 4-80), 1989 (Order 4-89, the version involved in this case), and again in 1998 (Order 4-98), no version exempted the on-site construction industry. Order 4-98 eliminated the daily overtime requirement found in prior orders (i.e., it no longer required overtime pay for labor beyond 8 hours per day), and instead provided that overtime was due only for work in excess of a 40-hour workweek. (Cal.Code Regs., tit. 8, § 11040, subd. 3(A).) However, it was subsequently declared void and Order 4-89 was reinstated.[6]
Nonetheless, until this appeal, the DLSE and the Labor Commissioner have unwaveringly declared, in statements public and private, that the on-site construction industry was not covered by any wage order. At a public hearing in June 1975, the IWC unanimously adopted a motion that "the need for orders in on-site construction, drilling, mining, and logging activities be investigated." In 1976, the commission issued a statement of findings in connection with the revisions of its wage orders that year, in which it declared: "On-site construction, on-site drilling and mining, and on-site logging operations are not covered by I.W.C. orders because wage boards representing those activities *913 have not been called." Like statements were made at public hearings in 1978 and 1979.
In 1980, when the IWC set a new state minimum wage in Order MW-80, the order reiterated that "[e]mployees engaged in certain on-site activities in ... construction are not covered by Industrial Welfare Commission industry and occupation orders...." (Cal.Code Regs., tit. 8, former § 11560.[7])
The DLSE, as the separate agency responsible for enforcing IWC orders, also took the position that Wage Order 4-89 did not apply to the on-site construction industry. This is reflected in its 1986 pamphlet, "Which IWC OrderClassifications," which states that IWC orders do not apply to on-site construction, on-site logging, or on-site drilling and mining activities. A 1998 "Enforcement Policies and Interpretations Manual" published by the DLSE says the same thing: "Workers involved in on-site construction ... are not covered by any Order of the Commission." To the same effect are several opinion letters prepared by the DLSE between 1989 and 1992, in response to the inquiries of private parties seeking advice on the applicability of wage orders.[8]
In the trial court, the previous Labor Commissioner opposed the petition on two grounds. First, he argued that the decision not to act on claims involving on-site construction was unreviewable because it was a valid exercise of his discretion to set enforcement policy and decide which claims to pursue. Second, he contended that as a matter of law, Wage Order 4-89 did not apply to the construction industry. The trial judge ruled that the Labor Commissioner acted within his discretion, and he denied the petition without considering whether Wage Order 4-89 applied to construction activities. We agree that the petition was properly denied, but not for the reason given by the trial judge.

I
Hestand's argument is straightforward: Wage Order No. 4-89 covers workers in mechanical and kindred occupations, it does not exempt on-site construction, therefore a writ should issue to compel the Labor Commissioner to accept and investigate his claim. He contends, without citation of authority, that extrinsic evidence of the IWC's intent may not be considered in interpreting a regulation that is unambiguous on its face.
The essence of Labor Commissioner's argument is that she has absolute discretion to act or not act on a wage claim, so the writ petition was properly denied. But she has followed a tortuous path on the question of whether Hestand's claim is covered by Wage Order 4-89. In her initial brief, the new commissioner abandoned the position taken by her predecessors and agreed that on-site construction workers are covered. After amicus curiae (Association of Energy Service Companies, California Chapter, and Veco Drilling, Inc.) and Odebrecht took up the cudgels and urged reversal in accord with the DLSE's prior policy, she again changed course.
The Labor Commissioner now says that in light of this litigation and the DLSE's prior policy, the department will not henceforth consider claims from employees in on-site construction, drilling, mining or logging that seek to enforce the overtime pay provisions of Order 4-89.[9] The one thing that is clear throughout the commissioner's wavering course is the insistence *914 that her call is final and we may not review it. In that she is mistaken.
A writ of mandate lies to compel the performance of an act which the law specifically requires (Code Civ. Proc, § 1085), but not to control the discretion lawfully entrusted to an administrative agency. (Pipe Trades Dist. Council No. 51 v. Aubry (1996) 41 Cal.App.4th 1457, 1468, 49 Cal.Rptr.2d 208.) Mandate may be brought to review an agency's interpretation of a controlling statute (Belridge Farms v. Agricultural Labor Relations Bd. (1978) 21 Cal.3d 551, 559, 147 Cal. Rptr. 165, 580 P.2d 665), and likewise an agency's interpretation of its own regulations. (Motion Picture Studio Teachers & Welfare Workers v. Millan (1996) 51 Cal. App.4th 1190, 1196, 59 Cal.Rptr.2d 608.) The Labor Commissioner concedes that the correct meaning of a regulation is a question of law for the court, and we perceive that to be the controlling issue in this case. Mandamus is therefore available to review the DLSE's interpretation of Wage Order 4-89.
The Labor Commissioner is likewise mistaken when she contends that what is at issue is her discretion to decide upon a course of action once a complaint is filed. She points to section 98, subdivision (a), which gives the commissioner authority to investigate employee complaints, and either provide a hearing, file a civil action on behalf of the employee, or take no further action. But in this case, the choice she madeto take no action on Hestand's complaintwas dictated by her interpretation that Wage Order 4-89 did not apply to on-site construction. Indeed, the Labor Commissioner's vacillating stance in this litigation well illustrates that what is at issue is the agency's interpretation of that order. The case began under the helm of the prior commissioner, who declined to investigate the complaint based on his view that Wage Order 4-89 was inapplicable. When the present incumbent took office, she initially read the order differently, agreeing with Hestand that it covered on-site construction workers but then retreated to her predecessor's view. The only variable has been the commissioner's reading of Wage Order 4-89. The fundamental question remains whether the Labor Commissioner's interpretationany of themis correct.
Painting & Drywall Work Preservation Fund, Inc. v. Aubry (1988) 206 Cal.App.3d 682, 253 Cal.Rptr. 776, relied upon by the commissioner, is distinguishable. There, the court reversed a writ of mandamus that directed the DLSE to take a prescribed course of conduct upon the filing of a complaint, explaining that it was within the Labor Commissioner's discretion to determine what action to take. (Id. at p. 688, 253 Cal.Rptr. 776.) Here, Hestand sought only to compel the DLSE to process his complaint, and did not ask that it be directed to take one or another path. Discretion was, therefore, not involved. Moreover, that case did not involve the agency's interpretation of a controlling regulation, to which we now turn.[10]

II
The DLSE's varying interpretations of Wage Order 4-89that it does and does not apply to the on-site construction industryamount to regulations within the meaning of the Administrative Procedure Act (APA). (Gov.Code, § 11340 et seq.) Since neither was adopted in accordance with the APA, both are void.
As the agency charged with enforcing the labor laws, the DLSE has the authority *915 to promulgate regulations and rules of practice and procedure necessary to carry out its duties. (§ 98.8.) The agency's ability to adopt an informal enforcement policy without complying with the APA was considered, and rejected, in Tidewater Marine Western, Inc. v. Bradshaw (1996) 14 Cal.4th 557, 59 Cal.Rptr.2d 186, 927 P.2d 296. There, the Supreme Court held that the DLSE is subject to the APA (id. at pp. 570-571, 59 Cal.Rptr.2d 186, 927 P.2d 296), and it concluded that the agency's interpretation of two wage orders amounted to a regulation, but one that was void for failure to abide by the APA.[11] (Id. at p. 572, 59 Cal.Rptr.2d 186, 927 P.2d 296.)
In Tidewater Marine, the DLSE had issued an "Operations and Procedures Manual," available to the public upon request. It included the agency's interpretation that IWC wage orders applied to the crews of various ships operating in the Santa Barbara Channel, so long as the vessels sailed exclusively between California ports and the employees were California residents who entered into employment contracts in California. (Tidewater Marine Western, Inc. v. Bradshaw, supra, 14 Cal.4th at p. 562, 59 Cal.Rptr.2d 186, 927 P.2d 296.) The court explained that "[a] regulation subject to the APA thus has two principal identifying characteristics. [Citations.] First, the agency must intend its rule to apply generally, rather than in a specific case.... Second, the rule must `implement, interpret, or make specific the law enforced or administered by [the agency], or ... govern [the agency's] procedure.' [Citation.]" (Id. at p. 571, 59 Cal. Rptr.2d 186, 927 P.2d 296.) It concluded that the policy in question was a regulation because it was expressly intended as a rule of general application, and "the policy interprets the law that the DLSE enforces by determining the scope of the IWC wage orders." (Id at p. 572, 59 Cal.Rptr.2d 186, 927 P.2d 296.) The same is true in this case.
Here, it is undisputed that the DLSE, both past and present, intended its policy regarding Wage Order 4-89 to apply generally, and that policy unmistakably interpreted the breadth of a regulation the agency enforces. The DLSE never complied with the APA in adopting any of its positions, whether those of the present Labor Commissioner or her predecessors. So both the historical policy of non-applicability and the present one are void.
Tidewater Marine further guides our path in considering the weight to give to the DLSE's interpretation of Wage Order 4-89, and ultimately in determining whether it applies to the on-site construction industry. We do not defer to the agency's interpretation. To do so "`would permit an agency to flout the APA by penalizing those who were entitled to notice and opportunity to be heard but received neither. [Citation.]'" (Tidewater Marine Western, Inc. v. Bradshaw, supra, 14 Cal.4th at p. 576, 59 Cal.Rptr.2d 186, 927 P.2d 296.) Nor do we categorically reject the agency's position simply because it was procedurally defective. Rather, we must independently decide if the DLSE's interpretation of non-coverage was correct. (Id. at p. 577. 59 Cal.Rptr.2d 186, 927 P.2d 296.) It was.

III
The question we face is what weight to give to the IWC's unmistakable and seemingly authoritative statements that it did not intend to cover the construction industry in Wage Order 4. Principles of statutory construction guide us in this *916 task of reviewing an agency's quasi-legislative action. "Once a particular legislative intent has been ascertained, it must be given effect `"even though it may not be consistent with the strict letter of the statute."' [Citation.]" (Friends of Mammoth v. Board of Supervisors (1972) 8 Cal.3d 247, 259, 104 Cal.Rptr. 761, 502 P.2d 1049.)
The law cannot turn a blind eye toward what the public, the industry, and the DLSE were repeatedly told by the IWC that none of its wage orders covered the on-site construction industry. We cannot see any policy that would be advanced by ignoring what everyone knew, and we see several that would be violated. Hestand does not claim that he relied on Wage Order 4-89, or that he was unaware of the IWC/DLSE position it did not apply to on-site construction workers. Nor are we presented with any evidence that unions across the state were misled or confused. On the other hand, amicus curiae tell us that industry did rely on the IWC's stated position, assuming that the prevailing rule, provided by federal law, was that overtime pay kicked in after a 40-hour week but not an 8-hour day. The wisdom of daily overtime pay is a legislative question, one ill-suited to judicial resolution, and it has now been resolved by the Eight-Hour Day Restoration and Workplace Flexibility Act of 1999. Whether to apply the new daily overtime rule retroactively is equally a matter for the Legislature, where competing labor and industry concerns may properly be weighed and balanced.
In sum, mandamus was properly brought to review the DLSE's interpretation of Wage Order 4-89. Since the agency intended its view to be a rule of general application construing a regulation it enforced, its construction was itself a regulation, but one that was void because adopted without complying with the APA. Considering the scope of the wage order free of any duty to defer to the DLSE's position, we conclude that it was never intended to apply to the on-site construction activities, and petitioners are not entitled to relief.
The judgment appealed from is affirmed. Each side shall bear its own costs on appeal.
SILLS, P.J., and RYLAARSDAM, J., concur.
NOTES
[*] In denying review, the Supreme Court ordered that the opinion be not officially published. (See California Rules of CourtRules 976 and 977).
[1] Saunders was appointed Labor Commissioner in 1999, succeeding Jose Millan, the commissioner named in the petition below.
[2] All further statutory references are to the Labor Code unless otherwise indicated.
[3] The IWC has promulgated 15 wage orders, 12 covering various industries, 3 dealing with specific occupations, and 1 general minimum wage order. (See Morillion v. Royal Packing Co. (2000) 22 Cal.4th 575, 581, 94 Cal.Rptr.2d 3, 995 P.2d 139.)
[4] To adopt a wage order, the IWC must first hold a public hearing to investigate the adequacy of wages or employment conditions in a given industry or occupation. (§ 1178.) It then selects a wage board composed equally of employer and employee representatives, and the wage board makes its recommendation. (§ 1178.5, subds.(a), (b).) The IWC prepares proposed regulations and, in most cases, the agency must hold public hearings in three cities within the state (§ 1178.5, subd. (c)), preceded by published and mailed notice to each association of employers or employees affected by the hearing. (§ 1181, subds.(a), (b).) Then, the IWC must publish notice of any action that it takes in newspapers throughout the state, and mail copies of new regulations to affected employers. (§§ 1182.1, 1183.) Any aggrieved person may apply for a rehearing (§ 1188), and the public at large may petition the IWC to adopt new regulations. (§§ 1176.1, 1176.3.)
[5] We take judicial notice of the minutes of public meetings of the IWC and various public documents issued by that agency that are referred to in this opinion. (Evid.Code, §§ 452, 459.) Amicus Curiae Veco Drilling, Inc. requests that we take judicial notice of an unpublished decision in Bobby Joe Baker v. Veco Drilling, Inc. (Dec. 2, 1999, B123201), which we deem to be a request to cite an unpublished opinion. The request is denied, since there is no showing that the opinion is relevant as the law of the case, nor under the doctrines of res judicata or collateral estoppel. (Cal. Rules of Court, rule 977(b).)
[6] In 1999 the Legislature enacted the "Eight-Hour Day Restoration and Workplace Flexibility Act of 1999 (Stats. 1999, ch. 134 (A.B.60), codified at section 500 et seq. Among other things, it amended section 510 to provide that any work in excess of 8 hours in one workday, and any work in excess of 40 hours in any one workweek, must be compensated at overtime rates. (Stats. 1999, ch. 134 (A.B.60) § 4.) Numerous wage orders adopted in 1998 were declared void and their predecessors reinstated until the effective date of new orders to be adopted by the IWC. (Id., § 21.) Among the voided orders was No. 4-98, and among those reinstated was No. 4-89.

Thus, what was once a matter of agency regulation is now one of state law, and the scope of Order 4-89 is relevant only as to claims for daily overtime worked prior to January 1, 2000, the effective date of the new law.
[7] Former section 11560 was amended and renumbered as section 11000. (Cal.Code Regs., tit. 8, § 11000.)
[8] While the Commission correctly insists that the letters are not regulations and not subject to the provisions of the APA, they are nonetheless part of the record.
[9] The Labor Commissioner announced this latest position in a memorandum to the DLSE dated November 17, 1999.
[10] At oral argument, the Commissioner suggested that Post v. Palo/Haklar & Associates (2000) 23 Cal.4th 942, 98 Cal.Rptr.2d 671, 4 P.3d 928 supports her position that this case only involves a discretionary act that is not reviewable. We invited the parties to submit letter briefs on the applicability of the decision. The commissioner is straightforward in conceding the case is factually distinguishable, supporting her position only in dicta repeating the general rule that discretionary acts of the Commissioner are not reviewable. Post does not change our analysis.
[11] The APA sets forth the procedures for adoption of regulations by state agencies. An agency must give public notice of the proposed regulation, issue the complete text accompanied by a statement of reasons for the regulation, give interested parties an opportunity to comment, and respond in writing to public comments. (Gov.Code, § 11346.) The agency must then forward a file of all materials on which it has relied in the regulatory process to the Office of Administrative Law, which reviews the regulation for consistency with the law, clarity and necessity. (Gov. Code, §§ 11347.3,' subd. (b), 11349.1, 11349.3.)